# Exhibit 15

**From:** Austin Grossfeld <Austin.Grossfeld@Shearman.com>
**Sent:** Monday, February 20, 2023 3:46 PM
**To:** Karen Novotny <novotny@amyris.com>
**Cc:** Cassandra Cuellar <Cassandra.Cuellar@Shearman.com>; Michael Dorf <mdorf@shearman.com>; Jordan Altman <Jordan.Altman@Shearman.com>; JB Betker <JB.Betker@Shearman.com>; Doris Choi <dchoi@amyris.com>; Han Kieftenbeld <kieftenbeld@amyris.com>; Mike Rytokoski <rytokoski@amyris.com>; Andrew Shyjan <shyjan@amyris.com>
**Subject:** RE: ROFR

Hi Karen,

Per a recent discussion with Cassandra, attached please find the updated license with (i) the expansion of the Assigned IP from registered IP to all IP that is subject to the license (including unregistered know-how, trade secrets, and other IP that falls under Licensed IP, Distribution Agreement IP, Improvements, and ROFR IP), and (ii) the deletion of our changes to "Control" for Improvements and ROFR IP.

As previously mentioned, I just wanted to reiterate that we **strongly** recommend against these edits for the widespread impact it could have on Amyris' entire business (beyond Cosmetics Actives), especially with the addition of the royalty and 5-year term.  Furthermore, this edit to the definition of "Control" essentially makes that limitation worthless for Improvements and ROFR IP.  Essentially, Amyris would be obligated to license IP (that does not yet exist) regardless of

1

AMYRIS-0000097

whether it breaches any future agreements (so basically Amyris would never be able to enter an exclusive relationship with a third party for the ROFR IP).

Please let us know if you would like to discuss these potentially **critical** risks again.

Best,

**Austin Grossfeld**
Associate

**Shearman & Sterling LLP**
599 Lexington Avenue, New York, New York 10022-6069
D +1.212.848.7272  |  M +1.646.379.3997
Austin.Grossfeld@shearman.com  |  shearman.com



---

**From:** Karen Novotny <novotny@amyris.com>
**Sent:** Monday, February 20, 2023 4:41 PM
**To:** Cassandra Cuellar <Cassandra.Cuellar@Shearman.com>; Doris Choi <dchoi@amyris.com>; Han Kieftenbeld <kieftenbeld@amyris.com>; Mike Rytokoski <rytokoski@amyris.com>
**Cc:** Michael Dorf <mdorf@shearman.com>
**Subject:** RE: ROFR
**Importance:** High

███████████████████████████████████████

Karen Novotny (she/her) | 1-425-647-3943 (m)

---

**From:** Karen Novotny
**Sent:** Monday, February 20, 2023 2:20 PM
**To:** Cassandra Cuellar <Cassandra.Cuellar@Shearman.com>; Doris Choi <dchoi@amyris.com>; Han Kieftenbeld <kieftenbeld@amyris.com>; Mike Rytokoski <rytokoski@amyris.com>
**Cc:** Michael Dorf <mdorf@shearman.com>
**Subject:** RE: ROFR

███████████████████████████████████████████████

CONFIDENTIAL                                                                                                                                    AMYRIS-0000098



**Karen Novotny (she/her) |** 1-425-647-3943 (m)

**From:** Cassandra Cuellar <Cassandra.Cuellar@Shearman.com>
**Sent:** Monday, February 20, 2023 1:57 PM
**To:** Doris Choi <dchoi@amyris.com>; Han Kieftenbeld <kieftenbeld@amyris.com>; Karen Novotny <novotny@amyris.com>; Mike Rytokoski <rytokoski@amyris.com>
**Cc:** Michael Dorf <mdorf@shearman.com>
**Subject:** RE: ROFR

Adding Michael to the chain.

**Cassandra Cuellar**

D +1.512.647.1930
M +1.361.522.8179

**From:** Doris Choi <dchoi@amyris.com>
**Sent:** Monday, February 20, 2023 3:55 PM
**To:** Han Kieftenbeld <kieftenbeld@amyris.com>; Karen Novotny <novotny@amyris.com>; Mike Rytokoski <rytokoski@amyris.com>; Cassandra Cuellar <Cassandra.Cuellar@Shearman.com>
**Subject:** RE: ROFR

This APA is going to be publicly filed with our Q1 10-Q in May.

3

AMYRIS-0000099

Doris Choi | 1-626-235-1727 (m)

---

**From:** Han Kieftenbeld <kieftenbeld@amyris.com>
**Sent:** Monday, February 20, 2023 1:51 PM
**To:** Karen Novotny <novotny@amyris.com>; Mike Rytokoski <rytokoski@amyris.com>; Cassandra Cuellar <Cassandra.Cuellar@Shearman.com>
**Cc:** Doris Choi <dchoi@amyris.com>
**Subject:** RE: ROFR

<div style="background:black; height:60px;"></div>

Han

---

**From:** Karen Novotny <novotny@amyris.com>
**Sent:** Monday, February 20, 2023 1:33 PM
**To:** Mike Rytokoski <rytokoski@amyris.com>; Cassandra Cuellar <Cassandra.Cuellar@Shearman.com>
**Cc:** Doris Choi <dchoi@amyris.com>; Han Kieftenbeld <kieftenbeld@amyris.com>
**Subject:** RE: ROFR

<div style="background:black; height:60px;"></div>

Karen Novotny (she/her) | 1-425-647-3943 (m)

---

**From:** Mike Rytokoski <rytokoski@amyris.com>
**Sent:** Monday, February 20, 2023 1:30 PM
**To:** Cassandra Cuellar <Cassandra.Cuellar@Shearman.com>; Karen Novotny <novotny@amyris.com>
**Cc:** Doris Choi <dchoi@amyris.com>; Han Kieftenbeld <kieftenbeld@amyris.com>
**Subject:** ROFR

<div style="background:black; height:60px;"></div>

Thanks.

# amyris

**Mike Rytokoski | President – Consumer Brands (Accelerator)**
Mobile 1-650-445-2114 | rytokoski@amyris.com
http://www.amyris.com/ | 5885 Hollis St. Suite 100 Emeryville, California 94608

**Disclaimer**

Notice of Confidentiality: The information contained in this email message or any attachment(s) may be confidential and/or privileged and is intended for use only by the individual(s) to whom this message is addressed. If you are not the intended recipient, any dissemination, distribution, copying, or use is strictly prohibited. If you receive this e-mail message in error, please email the sender and destroy this message and remove the transmission from all computer directories (including email servers).

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

4

This communication and any attachments may be privileged or confidential. If you are not the intended recipient, you have received this in error and any review, distribution or copying of this communication is strictly prohibited. In such an event, please notify us immediately by reply email or by phone (collect at 212-848-4000) and immediately delete this message and all attachments. For further regulatory information please refer to our Legal Notice. For information about how Shearman & Sterling processes personal data please refer to this Privacy Notice.

CONFIDENTIAL                                                                                                    AMYRIS-0000101

# Exhibit 16

| | |
|---|---|
| **From:** | Doris Choi |
| **Sent:** | Tuesday, February 21, 2023 7:41 AM |
| **To:** | Ryan Panchadsaram |
| **Cc:** | Steve Mills; Geoffrey Duyk; Han Kieftenbeld |
| **Subject:** | RE: Privileged and confidential - AC meeting notes |

Ryan,

Thank you for your question.



Please let me know if you have any other questions.

Thanks,
Doris

Doris Choi | 1-626-235-1727 (m)

---

**From:** Ryan Panchadsaram <ryan@kleinerperkins.com>
**Sent:** Tuesday, February 21, 2023 6:56 AM
**To:** Doris Choi <dchoi@amyris.com>
**Cc:** Steve Mills <steven.mills55@gmail.com>; Geoffrey Duyk <geoffreyduyk@gmail.com>; Han Kieftenbeld <kieftenbeld@amyris.com>
**Subject:** RE: Privileged and confidential - AC meeting notes

Thanks Doris.



On Mon, Feb 20, 2023 at 7:15 PM, Doris Choi <dchoi@amyris.com> wrote:

Audit Committee members:

1

AMYRIS-0000102



Please let me know if you have any questions.


Regards,

Doris


Doris Choi | General Counsel

2

1-626-235-1727 (m)

www.amyris.com

---

**From:** Han Kieftenbeld <kieftenbeld@amyris.com>
**Sent:** Tuesday, February 14, 2023 6:35 PM
**To:** Ryan Panchadsaram <ryan@kleinerperkins.com>
**Cc:** Steve Mills <steven.mills55@gmail.com>; Geoffrey Duyk <geoffreyduyk@gmail.com>; Doris Choi <dchoi@amyris.com>
**Subject:** RE: Privileged and confidential - AC meeting notes

Ryan,



3

CONFIDENTIAL

AMYRIS-0000104



**From:** Ryan Panchadsaram <ryan@kleinerperkins.com>
**Sent:** Tuesday, February 14, 2023 12:22 PM
**To:** Han Kieftenbeld <kieftenbeld@amyris.com>
**Cc:** Steve Mills <steven.mills55@gmail.com>; Geoffrey Duyk <geoffreyduyk@gmail.com>; Doris Choi <dchoi@amyris.com>
**Subject:** RE: Privileged and confidential - AC meeting notes



On Mon, Feb 13, 2023 at 10:51 PM, Han Kieftenbeld <kieftenbeld@amyris.com> wrote:

4

AMYRIS-0000105



**From:** Ryan Panchadsaram <ryan@kleinerperkins.com>
**Sent:** Monday, February 13, 2023 4:03 PM
**To:** Han Kieftenbeld <kieftenbeld@amyris.com>
**Cc:** Steve Mills <steven.mills55@gmail.com>; Geoffrey Duyk <geoffreyduyk@gmail.com>; Doris Choi <dchoi@amyris.com>
**Subject:** Re: Privileged and confidential - AC meeting notes



On Mon, Feb 13, 2023 at 3:51 PM, Han Kieftenbeld <kieftenbeld@amyris.com> wrote:

Audit Committee,

See below.

 NIKKO TRANSACTION

- **Nikko status:**

5

                                                              AMYRIS-0000106

- We've negotiated a ~30-day extension from February 13 to March 17 to close our agreement with Nikko to purchase 49% of our JV partner's shares in Aprinnova [12.5% p.a. interest through closing; tax planning condition]

GIVAUDAN TRANSACTION

- **Givaudan consideration**:

  - $200M cash upfront
  - Up to $150M cash in future earnout payments

    - Consisting of **3 annual earnout milestones** based on **Aprinnova sales f**rom sale of squalane and hemisqualane

      - 1st earnout target = $50M
      - 2nd earnout target = $60M
      - 3rd earnout target -= $70M

  - **Manufacturing agreement** fees to supply squalane and hemisqualane to Givaudan under fixed prices for a seven-year period, after which the price will adjust to a cost plus 15% pricing structure.

- **Key terms:**

  - Exclusive, worldwide, irrevocable license to **manufacture and commercialize Squalane and Hemisqualane in cosmetics actives**
  - Assignment of our squalane and hemisqualane **distribution agreements** (including Nikko distribution agreement)
  - Transfer of Aprinnova business **trademarks**
  - **ROFR** to Givaudan with respect to commercialization of ingredients developed by AMRS in the field of cosmetic actives
  - Givaudan may, but is not required to, hire **Aprinnova employees.** Current expectation is that they won't
  - Standard reps and warranties
  - Closing conditions:

    - Delivery of License Agreement, Trademark Assignment, Manufacturing Agreement and other ancillary agreements
    - AMRS and Givaudan to agree on payment and other terms for **contract R&D services** (R&D Framework) for new ingredients in cosmetics actives, which may be licensed to Givaudan

- **Main documents**:

  - Asset Purchase Agreement
  - License Agreement
  - Manufacturing and Supply Agreement

- **Timing**:

  - sign by February 14-15; enter a 30-day HSR review period; close as early as mid-March, concurrently with closing of Nikko agreement.

6

- **Disclosures**:

    o Joint PR on Thursday morning, February 16, followed by 8-K filing

- **Law firms:**

    o Paul Weiss representing Givaudan. Shearman & Sterling representing Amyris.

## Disclaimer

Notice of Confidentiality: The information contained in this email message or any attachment(s) may be confidential and/or privileged and is intended for use only by the individual(s) to whom this message is addressed. If you are not the intended recipient, any dissemination, distribution, copying, or use is strictly prohibited. If you receive this e-mail message in error, please email the sender and destroy this message and remove the transmission from all computer directories (including email servers).

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

CONFIDENTIAL                                                                                    AMYRIS-0000108

**Exhibit 17**

| | |
|---|---|
| **From:** | John Melo |
| **Sent:** | Thursday, May 11, 2023 6:47 PM |
| **To:** | Adrian Merkt |
| **Cc:** | David Bradley |
| **Subject:** | Re: [EXTERNAL] Amyris NDA |
| **Attachments:** | Amyris NDA - NDA 05.11.2023.doc; Aprinnova Financials FY 2022.xlsx |

Adrian, here's a copy of the Givaudan SPA and the 2022 P&L for the business. For your assessment we view the earn-out at 90% or better probability at earning 90% or more based on demand and current year sales.

Thanks and happy to discuss as needed.

John


On May 11, 2023, at 4:33 PM, Thomas Nguyen <tnguyen5@jefferies.com> wrote:

> **CAUTION:** This message originated from outside of Amyris. Do not click links or open attachments unless you recognize the sender and are sure that the content is safe. If you are unsure, contact the sender via a separate message or call and verify.

John,
Hope you're doing well. As a follow-up to your discussion with David and Adrian today, please find attached the Amyris NDA for review.
The terms are the same as the previously signed NDA. If this works with you, please kindly share with us our countersigned copy for our record.
Thank you,
Thomas
Thomas Nguyen
Industrials
Jefferies LLC | 520 Madison Avenue | New York, NY 10022
Phone: +1 212 778-8312
Mobile: +1 901 438-2820
tnguyen5@jefferies.com

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

<Amyris NDA - NDA 05.11.2023.doc>

CONFIDENTIAL

**Exhibit 18**



CONFIDENTIAL
DRAFT

# Q1 2022 (Q4 Review) Board of Directors

MEETING
## 9 March 2022 08:00

PUBLISHED
8 March 2022

# Agenda

| Location | Date | Owner | Time |
| --- | --- | --- | --- |
| Virtual Meeting | 9/03/22 | | 08:00 |

1. Call to Order

2. Executive Session

    2.1. 2021 Board and Committee 360 Review/Self-Assessment Results

    2.2. Team and Organization

    2.3. Key Issues and Opportunities

    2.4. Other

3. Administrative Matters & Legal Updates

    3.1. Committee Reports

    3.2. Significant Transactions

    3.3. Board Resolutions

        3.3.1. Audit Committee Charter

        3.3.2. CD&A and LDICC Report

        3.3.3. Prior Meeting Minutes

    3.4. Litigation/Investigations Update

    3.5. Reference Materials

4. Operations and Financial Updates

    4.1. Operations Update

    4.2. Financial Review and Investor Relations Update

    4.3. 2022 Budget and Business Plan

*Continued on the next page...*

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

2

AMYRIS-0000111

# Agenda

| Location | Date | Owner | Time |
|---|---|---|---|
| Virtual Meeting | 9/03/22 | | 08:00 |

5. Strategy and Business Development Updates

  5.1. Strategy Update

  5.2. Portfolio and Pipeline Review

    5.2.1. New Brands Status: MenoLabs, Stripes, ONDA, DB Men, A$AP Rocky, India

    5.2.2. Project Pillar

    5.2.3. Project Pioneer

    5.2.4. Givaudan

    5.2.5. Walmart

    5.2.6. Experimental Retail Stores

    5.2.7. Geographic Expansion - UK, Brazil, Europe, and China

  5.3. Business Priorities

  5.4. 2022 Outlook

6. Executive Session

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

3

AMYRIS-0000112

# Call to Order

|  | Page |
|---|---|
| 1. Call to Order | 4 |

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

4

## 1.  AGENDA

1.  **Call to Order**........................................................................................................8:00 a.m.

2.  **Executive Session**...........................................................................8:00 a.m. – 8:45 a.m.
    *Amyris attendees: John Melo*
    *2.1 2021 Board and Committee 360 Review/Self-Assessment Results*
    *2.2 Team and Organization*
    *2.3 Key Issues and Opportunities*
    *2.4 Other*

3.  **Administrative Matters & Legal Updates** …………………………………....…8:45 a.m. – 9:15 a.m.
    *Amyris attendees: John Melo, Nicole Kelsey, Han Kieftenbeld*
    *3.1 Committee Reports*
    *3.2 Significant Transactions*
    *3.3 Board Resolutions*
    *3.4 Litigation/Investigations Update*
    *3.5 Reference Materials*

4.  **Operations and Financial Updates** ...................................................9:15 a.m. – 9:45 a.m.
    *Amyris attendees: John Melo, Eduardo Alvarez, Nicole Kelsey, Han Kieftenbeld*
    *4.1 Operations Update*
    *4.2 Financial Review and Investor Relations Update*
    *4.3 2022 Budget and Business Plan*

    **Break**.............................................................................................9:45 a.m. – 10:00 a.m.

5.  **Strategy and Business Development Updates** ...............................10:00 a.m. – 10:45 a.m.
    *Amyris attendees: John Melo, Eduardo Alvarez, Nicole Kelsey, Han Kieftenbeld*
    *5.1 Strategy Update*
    *5.2 Portfolio & Pipeline Review*
        *5.2.1   New Brands Status: MenoLabs, Stripes, ONDA, DB Men, A$AP Rocky, India*
        *5.2.2   Project Pillar*
        *5.2.3   Project Pioneer*
        *5.2.4   Givaudan*
        *5.2.5   Walmart*
        *5.2.6   Experiential Retail stores*
        *5.2.7   Geographic Expansion – UK, Brazil, Europe and China*
    *5.3 Business Priorities*
    *5.4 2022 Outlook*

6.  **Executive Session**.......................................................................10:45 a.m. – 11:00 a.m.
    *Amyris attendees: None*

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

5

AMYRIS-0000114

# Executive Session

*Page*

2. Executive Session                                                  6

    2.1. 2021 Board and Committee 360 Review/Self-Assessment Results

    2.2. Team and Organization

    2.3. Key Issues and Opportunities

    2.4. Other

1. Call to Order

**2. Executive Session**

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

6

March 5, 2022

**Amyris Board of Directors**

**March 2022 Board Meeting**

2021 was a transformative year for Amyris and the fourth quarter is a strong demonstration of our capacity to grow through the potential of our Lab-to-Market technology platform, our consumer business (both via ecommerce and retail) and providing access to our technology through new and existing collaborations and partnerships.

Interest in our business and technical capabilities has never been stronger, and the commercial success of our home-grown brands continues to confirm that we are just scratching the surface of end-markets that will benefit from sustainable products derived from clean chemistry, with No Compromise to performance.



The business integration of our Lab-to-Market technology platform, consumer brands, and technology access is clearly advantaged and puts Amyris at the forefront of the acceleration of sustainable consumption.

In 2021, we significantly simplified our business. We provided technology access by licensing the global distribution rights of our F&F ingredients to DSM while maintaining the fermentation manufacturing capability for most molecules developed in our portfolio. This enabled us to focus our growth on Health, Clean Beauty and Wellness end-markets where we have built the fastest growing consumer brands and to expand our innovation pipeline for new ingredients. Our track record has attracted industry leaders from Walmart to Unilever, along with some of the world's leading influencers, to partner with us to build and grow sustainable health and beauty brands for them.

The fourth quarter was our fourth consecutive quarter of double-digit revenue growth in our core business, which is the total of Consumer and Technology Access and excludes revenue from Strategic Transactions and certain one-off items. We are now in the fifth consecutive quarter of strong growth, with significant acceleration in our consumer business.

Our Q4 Core revenue increased 68% over the fourth quarter of 2021, with our consumer business delivering 86% growth year on year.

For the full year, we delivered 97% total revenue growth versus 2021 and our consumer business delivered 78% year-over-year growth. Our gross margin dollars grew 135% year over year and we managed our operating expense to 67% growth year over year.

CONFIDENTIAL

AMYRIS-0000116

1. Call to Order

2. Executive

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

Our existing brands continued to perform very well with the combined revenue of Biossance, Pipette, and PureCane setting a new record. Biossance growth is accelerating in the first quarter to about 2X over the first quarter of 2021, and we expect another very strong year from this group of category leading brands. Our new brands that include Costa Brazil, JVN Hair and Rose Inc. delivered excellent performance in the quarter with JVN Hair and Rose Inc. performing well beyond our expectations. This group of brands is on track for an incredible first quarter and a better than anticipated year. JVN Hair is on track for over $50 million in its first full year after 4 months in the market and Rose Inc. is tracking to about $25 million this year – both outstanding brands that provide leading clean and sustainable products in their respective categories.

For most of our brands, we are experiencing very strong physical store sales through our partners well beyond pre-Covid levels and we are maintaining a very healthy mix of around 50% of revenue from our own DTC web sites. For example, our JVN DTC on-line orders doubled every month during Q4, and this momentum has continued into 2022.

About 20% of our consumer revenue in the fourth quarter was from international markets and we expect this to significantly grow in 2022. Our international expansion is focused on the UK, Europe, Brazil, and China markets. These markets are delivering strong sales growth in the first quarter.

We opened two retail pop-up stores in Miami – one for the JVN brand and the other for Biossance. The Biossance store has remained open and will eventually become a brand showcase and experiential permanent retail store. We are currently seeing over 60% conversion to purchase for consumers coming into the store. In addition to the strong in-store performance, we also experienced a very strong improvement in Miami traffic to our Biossance.com site. As part of an omnichannel approach, we believe that an experiential store in key markets improves our growth on-line and accelerates our market share gains in these markets. Our goal is to limit our experiential retail presence to three to four key markets over the next year and also focus on flagship stores that provide a deep consumer experience with our brands. These stores will be opening in New York and London, and eventually in L.A. I expect these stores to deliver about $1 million of revenue for every 1,000 SF of selling space; this would represent about $20 million of revenue from our direct retail stores by the end of 2023.

We continue to make good progress on the construction of our new ingredients plant in Barra Bonita, Brazil, and we are on track for the start of production early in the second quarter. We have 800 contractors and employees on the construction site focused on delivering the most advanced fermentation factory in the world that will lead the world in producing natural ingredients in a sustainable way. We have managed through a significant spike in Covid cases at the start of the year that reduced the workforce on site by about 20%, and we continue to manage through significant labor and materials inflation that has significantly impacted our cost of building the plant. We have the capital needed to fully fund this ourselves, but it has been a challenging period. The construction budget has evolved from about 83 million to around $115 million. This is consistent with the inflation other major projects in the market have experienced along with project restart cost and design improvements. Eduardo's deck in your pre-read materials provides a very detailed update. We will dedicate about 30 minutes of our meeting to go deep on operations and plant projects during our meeting.

We completed our joint venture partnership with Minerva, one of the world's largest exporters of beef focused on lowering the carbon footprint when supplying the world with protein. We are focused on delivering our first product for commercial sales for this partnership in 2022 and very

AMYRIS-0000117

1. Call to Order

2. Executive

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

excited about the expansion of our technology platform into proteins. We also completed our joint venture with ImmunityBio for the advancement and commercialization of our ssRNA vaccine technology. The first technology application of our platform for ssRNA is Covid-19 and the protection and rapid response to future respiratory virus and potential pandemics. Our short-term focus is the successful completion of human clinical trials. This JV is focused on commercialization and requires very limited capital from Amyris. Immunity Bio has invested in manufacturing assets for 1 billion vaccines a year and is leading the clinical trial work. We will add commercialization capability to the JV once trials have proven successful.

We successfully scaled Squalene for vaccine adjuvant production direct from fermentation in the fourth quarter and expect this business to deliver strong revenue growth in 2022.

Since the close of the quarter, we agreed to terms with, and are very near closing the acquisition of MenoLabs, a leading brand in the menopause market with a portfolio of probiotics to address hot flashes and other common menopause symptoms. We view this as a significant addition to our portfolio and complementary to Stripes, the menopause brand we are building with Naomi Watts. We expect the combination of both brands to deliver more than $30 million in 2022 revenue with significant growth into 2023 and beyond. This underserved market, valued at around $15 billion in 2020 with double digit annual growth, is ideal for Amyris' science-backed approach to wellness and sustainability.

During the fourth quarter, we made important changes to align our company leadership structure and operating model with our business strategy. Consumer became our single biggest business in 2021. We organized our business around two key revenue components – Consumer and Technology Access. In Technology Access we combine R&D collaborations, technology licenses and ingredient product revenue. In Consumer, we include all of our activity that sells product or enables the execution of our consumer brands. In the fourth quarter and for full year 2021, each of these contributed about the same revenue.

## MULTI-YEAR REVENUE BY CATEGORY

| Last 4 Years | | | | Revenue $m | 2022 vs 2021 | | |
|---|---|---|---|---|---|---|---|
| 2018 | 2019 | 2020 | 2021 | | 2022 Target | 2021 | YoY% |
| 8.8 | 17.4 | 51.6 | 92.0 | Consumer | 296.0 | 92.0 | 222% |
| 44.8 | 62.8 | 69.5 | 96.0 | Technology Access | 134.0 | 96.0 | 39% |
| 53.6 | 80.2 | 121.1 | 188.0 | Core Total | 430.0 | 188.0 | 128% |
| 10.0 | 72.4 | 52.1 | 153.8 | Strategic Transactions/ One-off items | | 153.8 | -- |
| 63.6 | 152.6 | 173.1 | 341.8 | Reported Total | 430.0 | 341.8 | 26% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 24.8 | 42.5 | 52.7 | 58.7 | Ingredients Product | 81.0 | 58.7 | 38% |
| 20.0 | 20.3 | 16.7 | 17.4 | R&D Collaboration | 14.0 | 17.4 | -20% |
| | | | 20.0 | Technology Licenses/Earnout | 39.0 | 20.0 | 95% |
| 44.8 | 62.8 | 69.5 | 96.0 | Technology Access | 134.0 | 96.0 | 39% |

As part of simplifying and focusing our business, we recruited two experienced leaders to lead revenue and operations. Anne Myong has been appointed President of our Consumer business to partner with me and our brand leaders to support our accelerated growth. Anne is a

transformative leader. She helped lead the turnaround of Walmart in China and also led the transformation of the Walmart.com business. For Technology Access, we appointed Mike Rytokoski, a very experienced leader who recently led the China business for Goodyear and has expertise leading innovation and large B2B sales and marketing teams including at Unilever and Clorox. We also expanded the responsibilities of Catherine Gore who will continue to run Biossance and support the growth of the JVN Hair brand. Additionally, we expanded the responsibilities of Caroline Hadfield, who will continue as the leader of Rose Inc. and partner with me in the development and creation of new brands and on our consumer product innovation. This focused business structure and operating model, combined with our new leadership, is expected to bring better performance management and execution to our business.



1. Call to Order

2. Executive

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

10

AMYRIS-0000119

1. Call to Order

2. Executive

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

We have become a leading house of brands for the Health, Clean Beauty and Wellness markets. We have built incredible brands with category leadership in Clean Skin Care, Clean Hair Care, Clean Cosmetics, Clean Skin Care for Baby and families, and zero-calorie natural sweetener; and we are set to also lead with new launches this year in Clean Gen Z skin care and the menopause category.

<u>What differentiates us and has led to exponential growth in these markets?</u>

**Science** – we have the only Lab-to-Market platform in the Health, Clean Beauty and Wellness end-markets and we are applying our technology to make platform molecules that enable us to deliver the best performing products. And we are committed to staying ahead of competitors, our pipeline for new ingredients is growing – we are on track from growing new product introductions from 1-2 a year to well over 3-5, starting in 2022.

**Sustainability** – consumers are demanding sustainable products without compromise to performance; and we are the leading enablers of developing, scaling and producing the purest, cleanest and most sustainably sourced natural ingredients. We are the only company in the industry that has built a Lab-To-Market technology platform that enables us to quickly scale and manufacture products at both the lowest cost and the most sustainable.

**Marketing** – we have repeatedly built incredible brands. These are brands that consumers love and that are outperforming other brands in their respective categories.

**Business Model –** we are digital first, creating deep relationships with the leading specialty and mass retailers in the world that enable us to scale and access consumers in the most efficient way. This year, you can expect us to partner closely with some of the world's largest retailers to transform their health, beauty and wellness categories into fermentation-based, sustainably sourced products.

**NoCompromise** – Our NoCompromise promise enables us to lead the transition to a clean and sustainable future in Health, Clean Beauty and Wellness markets. We formulate the best

1. Call to Order

2. Executive

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

products in each of our categories and are the owners of the science that makes the most sustainably sourced platform molecules in these markets.

<u>Why does our leadership in consumer brands matter?</u>

We deliver the **most leverage of capital investment** to revenue dollars of any company in our sector. It's very challenging to grow efficiently or to any real scale of revenue when you are three to four steps removed from the consumer in the value chain. We generate 10x more revenue (or more) from every kg of product we produce when we sell to the consumer versus selling the molecule as an ingredient to industry or much worse through a license with a royalty for developing an organism for others. We've done this and know the economics well. This is why we invested in the best scale up and manufacturing capability in our industry and then experimented to develop the best way to builds great consumer brands with a scalable business model.

**We control our destiny** – developing organisms for others or selling ingredients to others places your growth rate, margin and future in the hands of others. We are committed to having significant impact in the sustainability and health of our planet. This has been true since the start of our company. It's our mission. It's impossible to have real impact and to deliver real solutions if you can't scale, manufacture, or deliver real products to consumers that enable them to live better lives without harm to our planet.

We **have invested in a transformative technology** for our planet. Biotechnology based fermentation is the future for impactful chemistry. We are the best at it and we have a responsibility to clean up the chemistry of the world in the fastest way possible. Imagine where we would be with electric cars if Elon Musk had to convince traditional car manufacturers to transition to electric? It would take 20-30 years longer at best and it would be too late to give our planet a real shot. That is not acceptable, and our scientists and I feel the responsibility and need to clean up the way chemistry is made now. Our latest scale up of Squalene for vaccine adjuvants is an incredible example of our capabilities: a complex molecule that many said was impossible to produce via biotechnology and fermentation that we developed from concept to full industrial scale fermentation in less than nine months. We are just starting to really thrive with our science and manufacturing and our next major priority is to expand this platform into Proteins.

Based on our current assets and business momentum, here's our outlook and financial framework -

1. **Accelerating consumer revenue growth** delivering much more than 150% growth in 2022 versus last year, with a very strong pipeline of new brands, new products, and new markets to support this growth for well into the future.

2. **Technology access revenue growth** continuing at 30-40% annually for the next few years, including 2022.

3. **Delivering positive cash from operations** in the fourth quarter. This excludes capital expenditures and new brand expense.

12

AMYRIS-0000121

1. Call to Order

2. Executive

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

In addition to this financial framework, we have several key deliverables to track our progress

1. **Consumer product manufacturing to be at least 70%** in controlled factories by the fourth quarter. The combination of this deliverable and moving to our own fulfillment will add an estimated 500 basis points of gross margin improvement to our consumer business in the second half of 2022. As of the end of the first quarter, we already have 10% of our highest volume products produced in Reno which is one quarter ahead of schedule.
2. **Achieve 6 million monthly consumer visits to our DTC web sites** by the fourth quarter, doubling the current number of visits.
3. Miami, NYC, and London branded **experiential retail open** and delivering operational profitability.
4. **Start-up Barra Bonita early in the second quarter** and have most of our ingredients produced in Barra Bonita in the second half of the year. This represents over $20 million of improvement to Ingredient gross profit dollars and enables the capture of $39 million earn-out from F&F ingredients
5. **Scale 3-5 new ingredients in 2022**
6. **Launch 3 new brands (2 homegrown and one purchased) – Stripes, EcoFabulous cosmetics and MenoLabs**
7. **Develop 4 new brands to launch in 2023 – David Beckham Men, A$SAP Rocky Men's, clean cosmetics for Southeast Asian skin, and Tia Mowry for Walmart with clean haircare**
8. **Build leadership in supply chain and fulfillment capability for consumer business and web operations and technology stack that is advantaged**

We are leading the world with a technology that's critical to making our planet healthy and sustainable. We are delivering what consumers are demanding and it's showing through our revenue growth.

We are evolving our company from one of the leading growth companies in our sector and the owner of the fastest growing consumer brands in Health, Clean Beauty and Wellness markets to also being a company that delivers operational excellence. Our goal is to end this year with the best growth we've ever delivered in our core business and doing it profitably.

Meeting discussion and desired outcomes

For our meeting this week, we will review our current operational performance in detail. The operations agenda Eduardo Alvarez is leading is expected to deliver over $71 million of gross profit improvement when you include the reduction to COGS and the necessary capacity for us to maximize our earnout with DSM of the F&F ingredients. In addition to this improvement, we expect an expansion of about 500 basis points to our consumer business gross margin. This is our biggest agenda for the year, and we will cover this in detail.

We will provide you an update on our 2022 business plan. We have a solid plan to deliver over $430 million of core business revenue at about a 60% gross margin. We have work to do regarding our cost base and do not have a final plan. My expectation is for a final plan that has about $400-$450 million of operating expense and an adjusted EBITDA of about -$160million. This represents declining losses through the year with the fourth quarter delivering slightly positive operating performance. Based on our latest view and the outlook for total cash needs

and opportunities, we do not expect to raise additional capital until we have consistent positive cash generation from operations.

We will review three major strategic step-out opportunities for which we would like to continue advancing discussions. These include:

1. China: review a major partnership in China to enable sustainable chemistry in China for leading Chinese companies.
2. Ingredient for Personal Care: discuss a deal with Givaudan for our cosmetics ingredients business along with a channel partnership to sell our future ingredients into the cosmetics industry (I expect this to generate $300-400 million of proceeds in 2022 if we conclude a deal);
3. Shaklee:  share status of the Shaklee opportunity that we explored at our last meeting.

There's a lot to work to do on each of these opportunities – these are each in service of unlocking significant shareholder value from our technology and current portfolio and in service of continued focus and expansion in our consumer business while being smart how we shift our capital allocation. My request here will be to setup a special committee of the Board to partner with me and management in exploring each of these strategic deals.

We will also take the time for a detailed review of deals in process and what we can expect over the next 60 days. These include:

- The purchase of Onda Beauty, a small retailer that brings leadership in beauty retailing and service offering.
- The structure and opportunity of a Clean haircare brand for Walmart with Tia Mowry
- Our international expansion, including the addition of Lee Tappenden as President of International Operations
- The potential purchase of Selia, a full-service e-commerce platform to help us scale internationally with our DTC offer
- The potential purchase of cosmetics manufacturing facility in Brazil to supply LatAm and Europe with production capacity that can scale up to 30 million units a year (about 70% of Reno projections)_
- Our operating model and evolution of our leadership structure. This will include a discussion around how we are evolving the future of how we work.

We are starting 2022 with the best momentum in our history. Our consumer business will likely deliver over 200% growth this year versus a market expectation of 150%. We have significant initiatives in place to help us become much more efficient and effective operators. My most critical goal is to evolve us from the fastest growing company and best performing in our sector into one of the best operating companies in the world. We have the strategy, talent, and assets to achieve this goal, and I welcome your help and support in partnering with me as we deliver this next transformation for our company.

1. Call to Order

2. Executive

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

14



2022 has been very challenging so far for equity markets. We are performing better than the Nasdaq and much better than the major biotech indexes, with the best relative share price performance versus our direct peer group by far. None of this is very helpful given that we are down about 10% for the year-to-date.

Our biggest current risks are current global events, the continued volatility we are living through, and the mental wellness of our teams (including how we keep connected and motivated at this time). Our employee turnover is well under industry average and declining, but I feel this is still a significant risk for us.

I'm looking forward to quality time with you this week. Please reach out to Han, Nicole, or I with questions.

Thanks

John

CONFIDENTIAL
AMYRIS-0000124

# Administrative Matters & Legal Updates

*Page*

3. Administrative Matters & Legal Updates      16

  3.1. Committee Reports

  3.2. Significant Transactions      17

  3.3. Board Resolutions      22

    3.3.1. Audit Committee Charter      26

    3.3.2. CD&A and LDICC Report      41

    3.3.3. Prior Meeting Minutes      65

  3.4. Litigation/Investigations Update      307

  3.5. Reference Materials      308

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

16

1. Call to Order

2. Executive Session

**3. Administrative**

4. Operations and

5. Strategy and

6. Executive Session

## 3. ADMINISTRATIVE MATTERS & LEGAL UPDATES

### 3.2.    SIGNIFICANT TRANSACTIONS

The Company entered into certain significant transactions that require <u>ratification</u> by the Board in accordance with the Company's internal controls and procedures. At its Q1 FY22 meeting, the Audit Committee reviewed and recommended that the Board ratify such transactions, as described below:

**3.2.1 <u>Related Party Agreements</u>:**

- **Farnesene Developer License Agreement with DSM Nutritional Products Ltd.:**
  - *Effective Date*: September 30, 2021
  - *Term:* 3-year base term + 3-year additional term (if DSM strain engineering leads to an improved Farnesene strain)
  - *Licenses*:
    - Amyris grants DSM a non-exclusive, royalty-free, world-wide, non-transferable, non-sublicensable license to Farnesene IP solely to conduct strain engineering to (a) improve performance of Amyris Farnesene strain and (b) perform process development and scale-up on potential improved Farnesene strains
    - DSM grants Amyris a non-exclusive, royalty-free, fully paid-up perpetual, irrevocable, worldwide, transferable, sub-licensable license to the potential improved Farnesene strains
  - *License Fee:* $6 million to Amyris (received on 12/22/2021)
  - *IP Ownership*:
    - Amyris retains ownership of all Farnesene IP
    - DSM owns all improvements, but it may only use them to make, import, and export improved Farnesene strains and use such strains at the Brotas facility for the purpose of producing and commercializing Farnesene, in each case, solely as permitted under existing licenses from Amyris

- **Amendment No. 1 to Supply Agreement with DSM Nutritional Products Ltd.:**
  - *Effective Date:* November 10, 2021
  - *Purpose*: Amyris will reduce the price of vanillin and patchouli by $2/kg (the "Incentive") to stimulate more rapid adoption of these products by the market
  - *Term*: from Effective Date until the cumulative value of the Incentive is $6.25 million
  - <u>*Supply Agreement*</u>: as part of Project Accelerate, Amyris manufactures certain ingredients for DSM to supply to Firmenich, Givaudan and Takasago
    - *Term*: 15 years
    - *Ingredients*: GAA, Patchouli, Manool, Sandalwood, Bisabolol, Vanillin, Sclareol and Retinol; Farnesene (for Takasago)
    - *Pricing*: fixed for 2021-2023 (longer for Vanillin); Cost + depreciation + 10% thereafter

**3.2.2    <u>Real Estate Lease Agreements</u>:**

- **NYC Retail and Office Space (408-414 West 13th Street, NY, NY)**
  - *Effective Date*: December 26, 2021
  - *Term*: 10 years with option to renew
  - *Rent*: $33 million over 10 years
  - *Size*: 27,813 sq. ft.

CONFIDENTIAL

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

- o *Use*:
  - ▪ *1st floor*: experiential retail space for sale of personal care, beauty, and nutrition products. Potentially, this space can also include a salon, spa, and creative studio
  - ▪ *2nd floor*: offices and storage

- **Miami Multibrand Flagship Store (114-120 NE 40th St. Miami, FL 33137)**
  - o *Effective Date*: August 19, 2021
  - o *Possession Date*: May 1, 2022
  - o *Term*: 10 years; option for additional 5-year renewal
  - o *Rent*: $10 million over 10 years, plus sales tax and 8% of gross sales exceeding breakpoint ($9.75 million in year one)
  - o *Size*: 4,500 rentable sq. ft.
  - o *Use*: flagship retail store for the sale of cosmetics, skincare products and/or fragrance, and spa services

- **Miami Biossance Store (JBL Building, Miami, Space No. 110 and 210)**
  - o *Effective Date*: August 23, 2021
  - o *Term*: 7 years
  - o *Rent*: $3.8 million over 6 years, plus monthly charges and 8% of gross sales exceeding breakpoint ($5.2 million in year one)
  - o *Size*: 2,762 sq. ft.
  - o *Use*: sale of skincare treatments and cosmetics, skincare products, fragrances, and hair care products
  - o *Other matters*: Amyris cannot have a store within 6-mile radius where Biossance products make up 95% or more of sales

- **Miami General Retail and Office (2734 NW 1st Avenue, Miami, FL)**
  - o *Estimated Effective Date*: May 1, 2022
  - o *Term*: 11 years and 6 months
  - o *Rent*: approximately $18 million over the term
  - o *Size*: 18,800 sq. ft.
  - o *Use*: hair salon, ancillary retail (including experiential retail) and office space
  - o *Other matters*: lease is contingent on landlord buying the property, which is expected to close in May or June 2022

- **London MG Empower Office (10-11 Clerkenwell Green, London, EC1R 0DP)**
  - o *Effective Date*: February 15, 2022
  - o *Term*: 10 years
  - o *Rent*: £12 million over 10 years
  - o *Use*: Office space for MG Empower and other Amyris subsidiaries
  - o *Other matters*: Amyris, Inc. is co-signing as guarantor for the lease

### 3.2.3 <u>Commercial Agreements</u>:

- **Formation of JV Subsidiary with ImmunityBio, Inc. (AccessBio Limited Liability Company Agreement)**
  - o *Effective Date*: December 31, 2021
  - o *Initial Contributions*:
  - o *Amyris*: $10 million, consisting of:
    - ▪ $9 million value for Amyris contribution of RNA Covid sublicense

18

- ▪ $1 million cash contribution
  - ○ *ImmunityBio*: $10 million, consisting of:
    - ▪ $9 million value for AccesBio's priority access to ImmunityBio's manufacturing capacity
    - ▪ $1 million cash contribution
  - ○ *Purpose*: 50/50 JV for clinical development, manufacture, and commercialization of Covid vaccine (RNA vaccine platform in the field of prevention and/or treatment of SARS-CoV-2)
  - ○ Upon completion of successful human trials and regulatory approval, the JV expects to start delivering the second-generation vaccine in 2022

- **Marketing Services Agreement with WeMedia Shopping Network Technology, Co., Limited**
  - ○ *Effective Date*: December 27, 2021
  - ○ *Payment*: $6.5 million
    - ▪ $4 million paid in January 2022
    - ▪ $2.5 million to be paid in April 2022
  - ○ *Purpose*: Marketing services (famous Chinese influencers) to support Biossance online sales in the Greater China Territory (including HK and Macau)

In addition, since the last meeting of the Board in Q4 FY21, the Company entered into or intends to enter into the following significant transactions that require <u>ratification</u> or <u>approval</u> by the Board in accordance with the Company's internal controls and procedures.

### 3.2.4    <u>M&A Agreements</u>:

- **Amendments to Renfield Agreements (EcoFab)**
  - ○ *Amended agreements*: Renfield Manufacturing Agreement and Right of First Refusal Agreement
  - ○ *Effective date*: February 21, 2022
  - ○ *Purpose*: AMRS's discretionary funding of the full estimated construction costs ($8.3 million) for completion of new Renfield manufacturing and fulfillment plant (Reno, NV)
    - ○ AMRS will have a credit against the purchase price payable for eventual purchase of the Renfield entity or manufacturing facility, in the amount equal to the aggregate amount of AMRS's funding of expansion costs and, in the event of a third party purchase of the Renfield entity or manufacturing facility, Renfield's repayment to Amyris of any such funding amount
    - ○ AMRS's current aggregate funding for equipment, engineering and construction costs incurred for the expansion of Renfield's new manufacturing facility totals $16.4 million ($8.1 million funding in 2021 + $8.3 million funding in 2022)
  - ○ *Other matters*: Marissa Shipman, through her family trust, is an owner of Renfield Manufacturing. On January 26, 2022, Ms. Shipman commenced employment with Amyris as Chief Creative Officer, Ecofabulous

- **Acquisition of Assets of MenoLabs LLC ("MenoLabs")**
  - ○ *Status*: Term Sheet executed on November 29, 2021
    - ▪ Definitive agreements expected to be signed by March 11, 2022
  - ○ *Purpose:* Amyris Clean Beauty, Inc. to purchase 100% of MenoLabs assets, including the MenoLife app. MenoLabs is focused on addressing perimenopause and menopause symptoms with research-backed all-natural treatments of menopause symptoms. MenoLabs has commercialized eight products, mostly supplements. MenoLabs generates a subscription based, recurring revenue stream via its website and sell via Amazon and is launching in mass retail.
  - ○ *Consideration*: up to $20 million in cash or AMRS shares, at AMRS discretion
    - ▪ $15 million at closing ($11.25 million in cash and $3.75 million in AMRS shares)

1. Call to Order

2. Executive Session

**3. Administrative**

4. Operations and

5. Strategy and

6. Executive Session

AMYRIS-0000128

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

- Up to $5 million earnout if target net sales of $20.7 million and 61% gross margin are achieved in the first 12 months after closing. An additional $5 million earnout if target net sales of $30 million and 58% gross margin are achieve in the first 12 months after closing. An additional $10 million earnout if target net sales of $25 million are achieved in Q4 2024 ($100 million run rate) and 58% gross margin.
- Adjustments and holdback: $1.0 million escrow and net working capital adjustment.
  - o *Closing Conditions*: completion of customary diligence. Key employees and founding team will join Amyris as employees.

- **Acquisition of ONDA Beauty, Inc. ("ONDA")**
  - o *Status*: Term Sheet executed on February 8, 2022; Purchase Agreement in final stage of negotiation
  - o *Purpose:* Amyris to acquire 100% of the issued and outstanding shares of ONDA
  - o *Structure*: One warrant holder (Naomi Watts) to receive $1.25M as transactional expense in exchange for continued contribution as co-founder of ONDA
  - o *Consideration*: $5 million in cash or AMRS shares, at AMRS discretion
    - Adjustments: working capital, acquired cash (if any), indebtedness and transaction costs
    - Holdback: 10% consideration holdback for indemnification obligations
  - o *Simultaneous Sign/Close*: end of March
  - o *Employees*: maintain current workforce on current terms
  - o *Indemnification*: 12 months for representations and warranties

- **Stripes Brand ("Stripes") (Issuance of AMRS shares to Naomi Watts, Founder and Chief Creative Officer of Stripes)**
  - o *Status*: Term Sheet executed on July 1, 2021; Brand and Consulting Agreements in final stage of negotiation
  - o *Purpose:* Amyris and Naomi Watts to develop and market menopause products with clean ingredients (skincare, haircare, personal care, supplements, etc.)
  - o *Brand Structure*: Amyris 70%, Naomi 30% (no legal entity)
  - o *Governance:* Advisory Board and Brand President appointed by Amyris and Naomi
    - o Naomi to be appointed as Founder and Chief Creative Officer with total annual compensation of $500,000 cash, and $500,000 to $700,000 in AMRS equity
  - o *Operations:* Amyris to provide formulation expertise, manufacturing, distribution, and operational functions
  - o *Intellectual Property:* developed by AMRS for Stripes, to be owned by Stripes HoldCo

- **Acquisition of Interfaces Industria E Comércio De Cosméticos Ltda. ("Interfaces")**, a cosmetics manufacturer headquartered in Vinhedo, Brazil (close to Campinas)
  - o *Status*: non-binding LOI executed on February 22nd
    - Definitive agreements expected to be signed by March 22nd following completion of the first pilot batch production and due diligence
  - o *Purpose*: acquisition of 100% of Interfaces stock
  - o *Consideration*: up to $12.7 million in cash
    - $3.18 million at closing
    - $3.18 million in 24 equal monthly installments from the start date of AMRS product production (within 90 days from closing)
    - $6.35 million earnout for José Roberto dos Santos (CEO) continued employment + certain milestone achievements

20

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

- o *Closing Conditions*:
    - ▪ Execution of definitive agreements (Quota Purchase Agreement)
    - ▪ Employment letter (5-year term) executed between Interfaces and CEO

- **Acquisition of Serviços De Gestão Empresarial Ltda ("Selia")**, a full-service provider of digital sales for retail and e-commerce businesses, including e-commerce platform, operations, marketing, finance, marketplace, logistics, customer service center, and tax planning
    - o *Status*: non-binding LOI executed on March 3rd
        - ▪ Definitive agreements expected to be signed by end of April following completion of due diligence
    - o *Purpose*: acquisition by AMRS of 60% of Selia stock
    - o *Consideration*: up to $20 million in cash
        - ▪ $16 million at closing
        - ▪ Up to $4 million earnout for the achievement of gross merchandise volume goals by February 2023
    - o *Closing Conditions*:
        - ▪ Execution of definitive agreements (SPA, Shareholders Agreement, Operating Agreement)
    - o *Break-Up Fee*: if AMRS or Selia Sellers fail to consummate the closing, the non-failing party receives 10% of the Consideration

### 3.2.5   Financing Agreements

- **WeMedia (SuperOrdinary affiliate) Convertible Note**
    - o *Borrower*: WeMedia Shopping Network Holdings Co., Limited (WeMedia)
        - o startup incorporated in British Virgin Islands
        - o parent of SuperOrdinary, a commercial partner of Biossance in the Greater China Territory
        - o 34% owned by Julian Reis and 66% owned by other investors
    - o *Status*: documents finalized between parties; accounting treatment research completed
    - o *Purpose*: bridge loan during interim period while WeMedia secures $150 million equity raise
    - o *Key Terms*:
        - ▪ Principal amount of Note: $10 million
        - ▪ Interest: compounding at 8% per year (accruing until Note is repaid or converted)
        - ▪ Maturity: 3 years (i.e., March 2025)
        - ▪ Security: senior secured  lien on all assets
        - ▪ Optional Conversion (at AMRS' option) upon:
            - ▪ IPO or De-SPAC – at the IPO price (no discount)
            - ▪ Equity Financing – at the Equity Financing price (no discount)
            - ▪ Sale of Company – at the Sale price (no discount)
            - ▪ Maturity – at the price of last equity round
        - ▪ Repayment of principal and accrued interest upon:
            - ▪ Receipt of $50M by WeMedia in one or more capital raise transactions (debt or equity)
            - ▪ Maturity
        - ▪ Customary representations and warranties
        - ▪ Customary covenants including ongoing access to financial information of WeMedia

21

AMYRIS-0000130

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

## 3.3.    BOARD RESOLUTIONS

**Corporate Governance Approvals**

### 3.3.1    Audit Committee Charter Amendment

We are asking the Board to approve amendments to the Audit Committee charter as part of our annual governance and compliance review cycle (typically held in Q4), which includes the review and benchmarking of committee charters, subject in each case to the recommendation of such amendments by the applicable committees. Certain changes to the Audit Committee charter were proposed by management to the Audit Committee in its Q4 FY21 meeting; the Audit Committee confirmed final changes to its charter at its Q1 FY22 meeting.

### 3.3.2    2022 Annual Meeting of Stockholders and Proxy Statement Matters

### A.    Proxy Statement; Inclusion of CD&A and LDICC Report in Proxy Statement

The Secretary's Corporate Legal team is working on the proxy statement (the "***Proxy Statement***") for the Company's 2022 Annual Meeting of Stockholders (the "***Annual Meeting***"). The Secretary will outline certain matters related to the Proxy Statement and Annual Meeting that require the Board's approval. She will share with the full Board a final draft of the Proxy Statement for its review and input by the end of March as she expects to file the preliminary Proxy Statement by April 1st and the definitive Proxy Statement by April 12th.

She is also asking the Board to approve the inclusion of the "Compensation Discussion and Analysis" section and the Leadership, Development, Inclusion and Compensation Committee (the "***LDICC***") Report in the Proxy Statement, subject to the recommendation of the LDICC at its March 8th meeting.

### B.    Stockholder Communications Procedures

The Secretary is asking the Board to approve and adopt the following procedures for stockholder communications with members of the Board in 2022, subject to the recommendation of the Nominating and Governance Committee (the "***NGC***")at its March 9th meeting. No changes to such procedures are being recommended at this time.[1]

---

[1] From the Company's 2021 Proxy Statement: "The Board  has established a process by which stockholders may communicate with the Board or any of its members, including the Board Chairman, or to the independent directors generally. Stockholders and other interested parties who wish to communicate with the Board or any of the directors may do so by sending written communications addressed to the Secretary of Amyris at 5885 Hollis Street, Suite 100, Emeryville, California 94608. The Board has directed that the Secretary will review all communications to determine whether they should be presented to the Board. Following such review, the Secretary will determine which communications will be compiled and submitted to the Board, or a selected group of directors or individual directors, on a periodic basis. The purpose of this screening is to allow the Board to avoid having to consider irrelevant or inappropriate communications (such as advertisements and solicitations). The screening procedure has been approved by a majority of the non-management directors of the Board. Directors may at any time request that the Secretary forward to them immediately all communications received for the Board. All communications directed to the Audit Committee in accordance with the procedures described above that relate to accounting, internal accounting controls or auditing matters involving Amyris will be promptly and directly forwarded to the Chairman of the Audit Committee who will direct distribution to the Audit Committee members as required."

CONFIDENTIAL

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

### C.    Section 16 Officers and Executive Officers

We are asking the Board to review the Company's Section 16 officers[2] and executive officers[3] for the purpose of our public filings with the SEC upon recommendations by the NGC at its March 9th meeting. Based on relevant SEC rules, the NGC is not proposing any changes to Section 16 officers and executive officers at this meeting. Therefore, we propose that the Board find that: (i) the Section 16 officers are John Melo, Han Kieftenbeld, Eduardo Alvarez and Nicole Kelsey, as well as Tony Hughes (due to his status as principal accounting officer); and (ii) the executive officers are John Melo, Han Kieftenbeld, Eduardo Alvarez and Nicole Kelsey.

### D.    Director Independence and Qualification Determinations

Under applicable securities laws and regulations, and the rules, regulations and listing requirements of Nasdaq (the "***Nasdaq Rules***"), the Board must make a determination regarding the independence of the members of the Board, and the Company must disclose in the Proxy Statement which members of the Board and the Board's committees are independent, in each case as determined by the Board under the Nasdaq Rules, which criteria for independence determinations include various objective standards and a subjective test.

Subject to the recommendation of the NGC at its March 9th meeting, we are proposing that the Board find that:

- the following non-employee directors are independent under the Nasdaq Rules, with a determination that such directors are free from any relationship that, in the Board's judgment, would interfere with the exercise of independent judgment in implementing the responsibilities of a director: John Doerr, Ana Dutra, Geoffrey Duyk, Frank Kung, James McCann, Steven Mills, Ryan Panchadsaram, Lisa Qi, and Julie Washington;

- the following directors are <u>not</u> independent under the Nasdaq Rules: (i) John Melo is not independent because he is an Amyris employee, and (ii) Philip Eykerman is not independent because he is an employee of Koninklijke DSM N.V. or its affiliates (with which we have commercial and financial relationship);

- a majority of the members of the Board is independent under the Nasdaq Rules;

- each of the NGC (Doerr, McCann and Qi), the Audit Committee (Duyk, Mills, and Panchadsaram) and the LDICC (McCann, Mills, Panchadsaram, and Washington) is composed exclusively of independent directors under applicable Nasdaq Rules;

---

[2] SEC Rule 16a-1(f) defines "officer" to mean:
*"... an issuer's president, principal financial officer, principal accounting officer (or, if there is no such accounting officer, the controller), any vice-president of the issuer in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the issuer. Officers of the issuer's parent(s) or subsidiaries shall be deemed officers of the issuer if they perform such policy-making functions for the issuer."*

[3] SEC Rule 3b-7 defines "executive officer" to mean, when used with reference to a registrant:
*"...its president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant. Executive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant."*

K-000360

CONFIDENTIAL                                                                    AMYRIS-0000132

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

- all of the members of the Audit Committee meet the additional independence requirements applicable to audit committee members under the Nasdaq Rules and Rule 10A-3 of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***");[4]

- all of the members of the Audit Committee meet the Nasdaq Rules requirement that they be able to read and understand fundamental financial statements;

- Steven Mills, who serves as the Chair of the Audit Committee, is an "audit committee financial expert"; [5] and

- all of the members of the LDICC meet the additional independence requirements applicable to compensation committees under the Nasdaq Rules.[6]

In making the foregoing determinations regarding Board and committee independence and Audit Committee qualifications, the NGC referred to excerpts of the Nasdaq Rules and other applicable rules of the SEC relating to independence and audit committee qualifications and we note that the foregoing conclusions are based on input from legal counsel.

**E.    Director Nominations and Board Proposals**

Subject to the recommendation of the NGC at its March 9th meeting, we are asking the Board to:

- Nominate John Doerr, Ryan Panchadsaram and Lisa Qi for election as Class III directors at the 2022 Annual Meeting, to serve as Class III directors of Amyris until the expiration of their terms in 2025 and until such director's successor has been elected and qualified, or until such director's earlier death, resignation or removal.

- Authorize and direct the officers of Amyris to mail a Notice of Annual Meeting (or a Notice of Internet Availability of Proxy Materials as permitted by SEC rules) to the Company's stockholders of record as of the Annual Meeting record date (March 30th) and to solicit proxies for the voting of their shares with respect to the following matters:

  o Election of the Company's Class III directors: John Doerr, Ryan Panchadsaram and Lisa Qi.
  o Ratification of the appointment of the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.
  o Approval of an amendment to the Company's certificate of incorporation to increase the number of total authorized shares from 455,000,000 shares to [555,000,000] shares and the number of authorized shares of common stock from 450,000,000 shares to [550,000,000] shares.

- Authorize and direct the officers of Amyris to:

---

[4] Audit committee members are required to not receive fees other than standard director compensation and not be affiliates of the Company other than by virtue of being on the Board.

[5] As defined in SEC regulations, and meets the additional financial sophistication requirement for at least one member of the Audit Committee contained in Rule 5605(c) of the Nasdaq Rules.

[6] This includes consideration of all factors specifically relevant to determining whether a director has a relationship to Amyris that is material to that director's ability to be independent from management in connection with the duties of a compensation committee member, including, but not limited to: (i) the source of compensation of such director, including any consulting, advisory or other compensatory fee paid by Amyris to such director; and (ii) whether such director is affiliated with Amyris.

24

AMYRIS-0000133

1. Call to Order

2. Executive Session

3. Administrative

4. Operations and

5. Strategy and

6. Executive Session

- o prepare a Proxy Statement pursuant to Section 14(a) of the Exchange Act and file such Proxy Statement with the SEC and Nasdaq, and take all further actions deemed necessary or appropriate to cause the Company to perform its obligations in relation to the filing and distribution of the Proxy Statement; and

- o prepare, file with the appropriate governmental authorities, and mail (or make available via the internet as permitted by SEC rules) broker search cards, proxy materials, the Company's 2021 Annual Report and any other documents they may deem necessary or appropriate in connection with the Annual Meeting anticipated to be held on Friday, May 27, 2022, via webcast, at 2:00 p.m. Pacific Time.

### 3.3.3    Prior Meeting Minutes

Draft minutes of the Q4FY21 meeting (November 17, 2021) of the Board are attached for review and approval.

25

AMYRIS-0000134

**Board Meeting**

<u>Date</u>:    March 9, 2022

<u>Time</u>:    8:38 — 11:05 am PT // Executive Sessions: 8:00 — 8:38 am PT//11:05 – 11:-- am PT

<u>Attendance</u>:    **Board:**    Phone/Zoom: John Doerr, Ana Dutra, Geoff Duyk (Zoom, off-screen; left at 9:56am; rejoined for final ES at 11:04am), Philip Eykerman (Phone) (left at 9am PT), Frank Kung, Jim McCann, Steve Mills, Ryan Panchadsaram, Lisa Qi, Julie Washington

                     **Absent:**

    **Observers:**    Phone/Zoom: Nate Dau (Zoom, off-screen)

                     **Absent:**

    **AMRS:**    JM, NLK (as of 8:40am), EA (as of 9:--am), HK (as of 8:--am), Lee Tappenden (as of 8:38 – 8:52am)

    **External:**    Gordy Davidson

**<u>2. Opening Executive Session</u> (8:00 – 8:38)**

*John Melo*

    2.1    *2021 Board and Committee 360 Review/Self-Assessment Results*
    2.2    *Team and Organization*
    2.3    *Key Issues and Opportunities*
    2.4    *Other*

---

**Notes**:

<u>LT</u>: Introduced himself w/ his professional path across operations, w/ a focus on international. Asked Board for any questions; w/ no questions, outlined frontline goals (1) to build strategic partnerships (not to spread across too many retailers), (2) channel management and (3) brand awareness building. Also need to set up a matrix system to work that really delivers on growth; in order to (a) operate w/ discipline (b) production & supply chain, global piece will be critical to get ahead of that in the first 6 months in order to deliver on 2/3-yr plan and (c) talent, best from the start.

<u>AD</u>: You have mastered the growth program for Walmart, but now looking at BR, UK, CH – how do you envision your growth strategy as each of these regions will require a specific geopolitical approach?

<u>LT</u>: Local partners are key to really understand the market. CH is a huge opportunity but also littered by retailers that have not succeeded, must focus

<u>JMcC</u>: D2C, what role to develop the brand & round out the consumers in each mkt?

<u>LT</u>: Will change for each mkt; my point about matrix, map out each brand for each mkt. SM will play a huge part in brand awareness; and forging right relationships w/ right partners will increase brand awareness. Huge opportunity to drive loyalty at low capital to further develop brand awareness.

<u>JM</u>: Growth potential is about $50M international, $150M North America. Awareness in NA is ~10%, some places at 0%. D2C growth is #1 channel in NA. $50M global: $15M CH, $15M UK, $15M other. In UK, our London office: several different businesses: Rose Inc.; new DB brand in development; MGEmpower (influencer marketing agency); BL (AI & beauty app developer). LT will be located there & have overall responsibility for UK activities.

---

AMYRIS-0000135

JM: Any other questions before moving to NLK to manage admin section of the mtg?
SM: Great to meet LT, heard him reference "discipline" more than once which I love to hear.
JM: The back office piece is where we have a lot of work; operations; invoice processing; matching infrastructure to the business we are running; amount of work for finance team for this past 10-K audit.

**3. Administrative Matters & Legal Updates (8:54 -- 9:15)**

*John Melo, Nicole Kelsey and Han Kieftenbeld*

**3.1. Committee Reports**

**Audit Committee (Mills) – February 22nd (8:54 – 9:01am)**
    1) AC approvals only:
        a.  Approval of Minutes: November 1, 2021 (Q4 meeting), November 9, 2021 (ATM parameters), December 28, 2021 (Buyback discussion); November 9, 2021 (Pricing Committee minutes)
        b.  Proxy Statement Report of the Audit Committee
        c.  10-K Review and Filing

    2) AC approvals and recommendations to Board:
        a.  Committee Charter amendment [Board Resolutions Section 3.3.1]
        b.  Related Party Transactions [All described under section 3.2 of Board Book]
            i.  Farnesene Developer License Agreement with DSM
            ii.  Amendment No. 1 to Supply Agreement with DSM
        c.  Significant Transactions [All described under section 3.2 of Board Book]
            i.  Real Estate Lease Agreements
                 1.  NYC Retail and Office Space (408-414 West 13th Street, NY, NY)
                 2.  Miami Multibrand Flagship Store (114-120 NE 40th St. Miami, FL 33137)
                 3.  Miami Biossance Store (JBL Building, Miami, Space No. 110 and 210)
                 4.  Miami General Retail and Office (2734 NW 1st Avenue, Miami, FL)
                 5.  London MG Empower Office (10-11 Clerkenwell Green, London, EC1R 0DP)
            ii.  Commercial Agreements
                 1.  Formation of JV Subsidiary with ImmunityBio, Inc. (AccessBio Limited Liability Company Agreement)
                 2.  Marketing Services Agreement with WeMedia Shopping Network Technology, Co., Limited

    3) AC other review and update items:
        a.  Update on whistleblower activity (none)
        b.  Risk Oversight and Compliance
        c.  Internal controls/ERM update
        d.  Treasury/Financing matters
        e.  CAO report

CONFIDENTIAL

    f.   Financial Results and Earnings Release
    g.   MGO Report
    h.   Executive Session
        a.   Legal
        b.   Finance

---

**Notes**:

<u>SM</u>: Outlined the interim mtgs of the Cmt; then reviewed all the matters outlined above by the Cmt in its Q1FY22 mtg. ERP systems too complex, FY22 priority to simplify; Shared Services Center just started. These things take time. Q4FY21 financial matters & FY21-end results, and reporting: earnings release & the 10-K; Cmt received drafts by email w/ earnings released on 03.01st, 10-K filed this morning through 12b-25 extension filing. MGO got hung up by Quality Control in home office, is being reviewed by the PCAOB & our audit will probably be part of that audit. I will do a post-mortem w/ HK & the rest of the Cmt, as the ongoing delays were frustrating. Also serving as an independent cmt (Brock derivative SH suit); organized in December, interviewed & select o/c; have met as an independent cmt & w/ this o/c: NLK can fill you in on status of next steps; hopeful that NLK & o/c can get this settled so that our independent cmt can be dissolved. Lots going on w/ AC, Pricing Cmt & Independent Cmt.

<u>JM</u>: Would only add that the December Share Buyback mtg, had Ken Goldman & Gordy/FW join to ensure thorough discussion & decided to not proceed.

**<u>Dates when Legal received earnings scripts:</u>**
- **FY20:**
  - <u>Q1</u>: received 3/8 – earnings on 3/12
  - Q2: didn't receive
  - Q3: didn't receive
  - Q4: received 11/3 – earnings on 11/5
- **FY21:**
  - <u>Q1</u>: received 3/1 – earnings on 3/2
  - Q2: received on 5/5 – earnings on 5/6
  - Q3: received on 8/4 – earnings on 8/5
  - Q4: didn't receive
- **FY22:**
  - <u>Q1</u>: received 3/1 – earnings on 3/2

---

**NGC (Doerr) – March 9th (9:01 – 9:06am)**

1) <u>NGC approvals only</u>:
    a.   Prior meeting minutes: November 17th (Q4 meeting)

2) <u>NGC approvals and recommendations to Board</u>: [Board Resolutions Section 3.3.2]
    a.   Proxy Statement (to be shared with Board by the end of March)
    b.   Procedures for stockholder communications with the Board
    c.   Section 16 officers and executive officers
    d.   Director independence and other qualifications
    e.   Director nominations and Board proposals

AMYRIS-0000137

       i. MGO engagement
      ii. Increase in authorized share capital
    **f.** **Ana Dutra to join LDICC in Q2FY22 meeting [Board Resolution required; AD abstaining from this vote]**

3) <u>NGC other review and update items</u>:
    a. Board and committee 360 review/self-assessment results: results summarized by Gordy/Fenwick
    b. Board and committee structure, composition and leadership
       i. Potential candidate reviewed
    c. Director education: shareholder engagement initiative
    d. ESG Report Update
    e. Review Directors' service on other Boards
    f. Committee Agenda Planner and Master Board Calendar

---

**Notes**:
<u>JD</u>: Provided summary: all Board matters were approved. AD joining LDICC for Q2FY22 meeting, approved w/ AD abstaining. Gordy provided the review to the full Board; JM & SM to take action.

**[TAKE-AWAY #9: JM & SM to take action re Board composition]**

---

**LDICC (McCann) – March 8th (9:06 – 9:11 am)**

1) <u>LDICC approvals only</u>:
    a. Prior meeting minutes: November 16th (Q4 meeting) and December 22, 2021 (Succession Plan)
    b. Q4 2021 Corporate Incentive (CIP) Funding (85%)
    c. Annual 2021 Corporate Incentive (CIP) Funding (99%)
    d. 2022 Incentive Plan Design (changes to Brand Incentive Plan)
    e. Ratify Ana Dutra's initial grant of 20,000 RSUs
    f. Executive Session
       i. Q4 and Annual 2021 CEO and Executive Officer CIP Payments
      ii. Titles changes:
         1. TH: Corporate Controller and Chief Accounting Officer
         2. NK: Chief Legal Officer
         3. HK: Chief Financial & Administration Officer

2) <u>LDICC approvals and recommendations to Board</u>:
    a. Inclusion of CD&A and LDICC Report in Proxy Statement

3) <u>LDICC other review and update items</u>:
    a. Q4 2021 equity utilization (fully diluted annual burn rate of 3.54%)
    b. MCEA Update
    c. 2022 Employee Equity Program (burn rate increase due to drop in stock price)

    d.   Regulatory Update (WFH & back-to-office patterns, geographic distinctions in pay bands, DEI, SEC clawback rule, deeper employee data disclosure)
    e.   LDICC Charter Checklist and Planner
    f.   Q4 2021 Turnover Trends (low turnover rate)
    g.   DEI Update (new VP, DEI&B)

4) <u>Special LDICC meeting to be scheduled in April:</u>
    a.   2022 CIP Funding Targets
    b.   Review the Non-Employee Director Compensation Program to Consider Including Initial Equity Grants
    c.   2022 Officer Performance Metrics
    d.   Executive Compensation review
    e.   Executive Severance Plan
    f.   Compensation Consultant Independence & Engagement
    g.   Brand Incentive Plan (OKRs) for review

---

**Notes**:

JMcC: Provided summary of matters outlined above. Asked JM to outline the 3 title changes.
JM: You bet, re TH: aligning title to his real function; w/ NLK, more strategic role in transactions & leadership across the organization; w/ HK, has been having HR & other functions (like IT) reporting into him, aligning title to activities underneath him.
JMcC: Outlined other matters reviewed by the Cmt, not requiring any Cmt/BoD approvals. Turnover trend, new VP, DEI&B just started on Monday. We'll hold another Cmt mtg in April to review certain matters not having enough time to review with adequate time in this quarter's meeting (insert list from above).

---

**3.2.**    **SIGNIFICANT TRANSACTIONS (9:12- 9:34AM)**

The Company entered into certain significant transactions that require ratification by the Board in accordance with the Company's internal controls and procedures. At its Q1 FY22 meeting, the Audit Committee reviewed and recommended that the Board ratify such transactions, as described below:

**3.2.1 Related Party Agreements:**

- **Farnesene Developer License Agreement with DSM Nutritional Products Ltd.:**
  - *Effective Date*: September 30, 2021
  - *Term*: 3-year base term + 3-year additional term (if DSM strain engineering leads to an improved Farnesene strain)
  - *Licenses*:
    - Amyris grants DSM a non-exclusive, royalty-free, world-wide, non-transferable, non-sublicensable license to Farnesene IP solely to conduct strain engineering to (a) improve performance of Amyris Farnesene strain and (b) perform process development and scale-up on potential improved Farnesene strains

AMYRIS-0000139

- ▪ DSM grants Amyris a non-exclusive, royalty-free, fully paid-up perpetual, irrevocable, worldwide, transferable, sub-licensable license to the potential improved Farnesene strains
  - ○ *License Fee:* $6 million to Amyris (received on 12/22/2021)
  - ○ *IP Ownership:*
    - ▪ Amyris retains ownership of all Farnesene IP
    - ▪ DSM owns all improvements, but it may only use them to make, import, and export improved Farnesene strains and use such strains at the Brotas facility for the purpose of producing and commercializing Farnesene, in each case, solely as permitted under existing licenses from Amyris
      - - Vitamin E
      - - Human/animal health and/or human/animal nutrition fields (incl. HMOs, Vitamins A and B1)
      - - F&F (Vanillin, Manool, Patchouli, Sandalwood, GAA, Farnesene, Sclareol)

- **Amendment No. 1 to Supply Agreement with DSM Nutritional Products Ltd.:**
  - ○ *Effective Date:* November 10, 2021
  - ○ *Purpose:* Amyris will reduce the price of vanillin and patchouli by $2/kg (the "Incentive") to stimulate more rapid adoption of these products by the market
  - ○ *Term:* from Effective Date until the cumulative value of the Incentive is $6.25 million
  - ○ *Supply Agreement:* as part of Project Accelerate, Amyris manufactures certain ingredients for DSM to supply to Firmenich, Givaudan and Takasago
    - ▪ *Term:* 15 years
    - ▪ *Ingredients:* GAA, Patchouli, Manool, Sandalwood, Bisabolol, Vanillin, Sclareol and Retinol; Farnesene (for Takasago)
    - ▪ *Pricing:* fixed for 2021-2023 (longer for Vanillin); Cost + depreciation + 10% thereafter

### 3.2.2   Real Estate Lease Agreements:

- **NYC Retail and Office Space (408-414 West 13th Street, NY, NY)**
  - ○ *Effective Date:* December 26, 2021
  - ○ *Term:* 10 years with option to renew
  - ○ *Rent:* $33 million over 10 years
  - ○ *Size:* 27,813 sq. ft.
  - ○ *Use:*
    - ▪ *1st floor:* experiential retail space for sale of personal care, beauty, and nutrition products. Potentially, this space can also include a salon, spa, and creative studio
    - ▪ *2nd floor:* offices and storage

- **Miami Multibrand Flagship Store (114-120 NE 40th St. Miami, FL 33137)**
  - ○ *Effective Date:* August 19, 2021
  - ○ *Possession Date:* May 1, 2022
  - ○ *Term:* 10 years; option for additional 5-year renewal
  - ○ *Rent:* $10 million over 10 years, plus sales tax and 8% of gross sales exceeding breakpoint ($9.75 million in year one)
  - ○ *Size:* 4,500 rentable sq. ft.
  - ○ *Use:* flagship retail store for the sale of cosmetics, skincare products and/or fragrance, and spa services [Biossance, Pipette, Rose Inc., JVN, Olika]

- **Miami Biossance Store (JBL Building, Miami, Space No. 110 and 210)**

- o  *Effective Date*: August 23, 2021
- o  *Term*: 7 years
- o  *Rent*: $3.8 million over 6 years, plus monthly charges and 8% of gross sales exceeding breakpoint ($5.2 million in year one)
- o  *Size*: 2,762 sq. ft.
- o  *Use*: sale of skincare treatments and cosmetics, skincare products, fragrances, and hair care products
- o  *Other matters*: Amyris cannot have a store within 6-mile radius where Biossance products make up 95% or more of sales [this only applies to stores where Biosssance *makes up 95% or more of sales*. The other AMRS Miami stores are multi-brand stores + retail experiences and office spaces]

- **Miami General Retail and Office (2734 NW 1st Avenue, Miami, FL)**
  - o  *Estimated Effective Date*: May 1, 2022
  - o  *Term*: 11 years and 6 months
  - o  *Rent*: approximately $18 million over the term
  - o  *Size*: 18,800 sq. ft.
  - o  *Use*: hair salon, ancillary retail (including experiential retail) and office space
  - o  *Other matters*: lease is contingent on landlord buying the property, which is expected to close in May or June 2022

- **London MG Empower Office (10-11 Clerkenwell Green, London, EC1R 0DP)**
  - o  *Effective Date*: February 15, 2022
  - o  *Term*: 10 years
  - o  *Rent*: £12 million over 10 years
  - o  *Use*: Office space for MG Empower and other Amyris subsidiaries
  - o  *Other matters*: Amyris, Inc. is co-signing as guarantor for the lease
    - -  There is no sublease in place;
    - -  Tenant (MGE) is allowed to share occupation of the property with a Group Company (like Rose Inc. or BL), or a company within the same group of companies as the tenant.
    - -  BL's lease for their current space expires February 3, 2023.

### 3.2.3    Commercial Agreements:

- **Formation of JV Subsidiary with ImmunityBio, Inc. (AccessBio Limited Liability Company Agreement)**
  - o  *Effective Date*: December 31, 2021
  - o  *Initial Contributions*:
  - o  *Amyris*: $10 million, consisting of:
    - -  $9 million value for Amyris contribution of RNA Covid sublicense
    - -  $1 million cash contribution
  - o  *ImmunityBio*: $10 million, consisting of:
    - -  $9 million value for AccesBio's priority access to ImmunityBio's manufacturing capacity
    - -  $1 million cash contribution
  - o  *Purpose*: 50/50 JV for clinical development, manufacture, and commercialization of Covid vaccine (RNA vaccine platform in the field of prevention and/or treatment of SARS-CoV-2)
  - o  Upon completion of successful human trials and regulatory approval, the JV expects to start delivering the second-generation vaccine in 2022

AMYRIS-0000141

- **Marketing Services Agreement with WeMedia Shopping Network Technology, Co., Limited**
  - *Effective Date*: December 27, 2021
  - *Payment*: <mark>$6.5 million</mark>
    - <mark>$4 million paid in January 2022</mark>
    - <mark>$2.5 million to be paid in April 2022</mark>
  - *Purpose*: Marketing services (famous Chinese influencers) to support <mark>Biossance online sales in the Greater China Territory</mark> (including HK and Macau)

| <u>Status</u>: **for APPROVAL w/ recommendation by AC** | **APPROVED** ☒ <br> **CONDITIONALLY APPROVED** ☐ <br> **NOT APPROVED** ☐ |
|---|---|

**Notes**:
Re our **Spend Approval Authority Matrix**

**Currently**:
PO <mark>spend >**$5M** requires Board approval</mark> (PO spend of $500K-$5M requires CFO & CEO approval).

**Pain points**:
- threshold for Board approval seems low given growth of our business
- management needs flexibility to spend/invest without risk of SOX foot faults (e.g., we have 7 contracts >$5M that currently need Board ratification; 5 leases + 2 commercial ks)

**Proposal**: HK to discuss w/ SM:
1. Increase the threshold for Board approval to **$10M** (intended to cover M&A, IP, real estate, influencer spend)
2. CFO/CEO (in their discretion) may request Board to review/approve spend <$10M depending on nature of contract (multiyear, level of risk, etc.)
3. List of all spend between **$5M-10M** to be provided to Board quarterly (as FYI)

<mark>AC may review revised Matrix in Q2FY22 [HK]</mark>

<u>JD</u>: I note we have 3 RE locations in Miami; do we need an $18M commitment for office space? JM: Explained the full range of use for this space; need to look at this commitment, demand for space in this area of Miami is v high, made these moves quickly at a time that CVD was playing a big factor in the RE mkt, w/ the Design District currently completely sold out & the hottest retail area in the US.
<u>GD</u>: Are you & HK looking at where the revenue will be booked w/ all this new RE activity
<u>JM</u>: With more global footprint, looking at tax optimization w/ Deloitte
<u>JW</u>: NLK, effective date meaning w/ no possession, signed leases?
<u>NLK</u>: Correct
<u>JM</u>: Provided additional color on ImmunityBio JV, wanting another party to carry the costs for a clinical trial. Only the RNA IP in the JV, nothing else. Can we monetize the RNA technology for CVD and respiratory disease? Don't expect to put a lot of $ into it; will address that level of additional commitment for AMRS after we clear human clinical trials.
<u>FK</u>: Hard to determine how to measure vaccine construct for efficacy re different CVD variants. Don't put too much value on the outcome, as may be driven by type of patient available for the testing phase.
<u>JM</u>: Medical community (nurses) in South Africa for booster shot; Botswana, targeting one of the CVD variants.
<u>SM</u>: Review the M&A matters (including ratification, approval) in the Strategy session.
<u>NLK & JM</u>: Agreed.

CONFIDENTIAL

> JM: For retail: Miami, London & in FY23, LA. Biossance store in Miami, 64% conversion rate & rise in online traffic b/c of the awareness raised in local markets. This strategy is about building AMRS brand strategy & driving.
> JMcC: Get retail to build brand & also make $ is the golden goose of marketing.

In addition, since the last meeting of the Board in Q4 FY21, the Company entered into or intends to enter into the following significant transactions that require ratification or approval by the Board in accordance with the Company's internal controls and procedures.

### 3.2.4   M&A Agreements: (10:55 – 11:04am)

- **Amendments to Renfield Agreements (EcoFab)**
  - *Amended agreements*: Renfield Manufacturing Agreement and Right of First Refusal Agreement
  - *Effective date*: February 21, 2022
  - *Purpose*: AMRS's discretionary funding of the full estimated construction costs ($8.3 million) for completion of new Renfield manufacturing and fulfillment plant (Reno, NV)
    - AMRS will have a credit against the purchase price payable for eventual purchase of the Renfield entity or manufacturing facility, in the amount equal to the aggregate amount of AMRS's funding of expansion costs and, in the event of a third party purchase of the Renfield entity or manufacturing facility, Renfield's repayment to Amyris of any such funding amount
    - **AMRS's current aggregate funding for equipment, engineering and construction costs** incurred for the expansion of Renfield's new manufacturing facility **totals $16.4 million ($8.1 million funding in 2021 + $8.3 million funding in 2022)**
  - *Other matters*: Marissa Shipman, through her family trust, is an owner of Renfield Manufacturing. On January 26, 2022, Ms. Shipman commenced employment with Amyris as Chief Creative Officer, Ecofabulous

- **Acquisition of Assets of MenoLabs LLC ("MenoLabs")**
  - *Status*: Term Sheet executed on November 29, 2021
    - Definitive agreements expected to be signed by March 11, 2022
  - *Purpose:* Amyris Clean Beauty, Inc. to purchase 100% of MenoLabs assets, including the MenoLife app. MenoLabs is focused on addressing perimenopause and menopause symptoms with research-backed all-natural treatments of menopause symptoms. MenoLabs has commercialized eight products, mostly supplements. MenoLabs generates a subscription based, recurring revenue stream via its website and sell via Amazon and is launching in mass retail.
  - *Consideration*: up to $20 million in cash or AMRS shares, at AMRS discretion
    - $15 million at closing ($11.25 million in cash and $3.75 million in AMRS shares)
    - Up to $5 million earnout if target net sales of $20.7 million and 61% gross margin are achieved in the first 12 months after closing. An additional $5 million earnout if target net sales of $30 million and 58% gross margin are achieve in the first 12 months after closing. An additional $10 million earnout if target net sales of $25 million are achieved in Q4 2024 ($100 million run rate) and 58% gross margin.
    - Adjustments and holdback: $1.0 million escrow and net working capital adjustment.
  - *Closing Conditions*: completion of customary diligence. Key employees and founding team will join Amyris as employees.

- **Acquisition of ONDA Beauty, Inc. ("ONDA")**
  - *Status*: Term Sheet executed on February 8, 2022; Purchase Agreement in final stage of negotiation
  - *Purpose:* Amyris to acquire 100% of the issued and outstanding shares of ONDA
  - *Structure*:  One warrant holder (Naomi Watts) to receive $1.25M as transactional expense in exchange for continued contribution as co-founder of OND
    – Consulting Agreement
      - 6 equal payments of $208,333 on each of June 30 and December 31 (3 years) in cash or shares, at AMRS discretion
  - *Consideration*: $5 million in cash or AMRS shares, at AMRS discretion
    - <u>Adjustments</u>: working capital, acquired cash (if any), indebtedness and transaction costs
    - <u>Holdback</u>: 10% consideration holdback for indemnification obligations
  - *Simultaneous Sign/Close*: end of March
  - *Employees*: maintain current workforce on current terms
  - *Indemnification*: 12 months for representations and warranties

- **Stripes Brand ("Stripes") (Issuance of AMRS shares to Naomi Watts, Founder and Chief Creative Officer of Stripes)**
  - *Status*: Term Sheet executed on July 1, 2021; Brand and Consulting Agreements in final stage of negotiation
  - *Purpose:* Amyris and Naomi Watts to develop and market menopause products with clean ingredients (skincare, haircare, personal care, supplements, etc.)
  - *Brand Structure*: Amyris 70%, Naomi 30% (no legal entity)
  - *Governance:* Advisory Board and Brand President appointed by Amyris and Naomi
    - Naomi to be appointed as Founder and Chief Creative Officer with total annual compensation of $500,000 cash, and $500,000 to $700,000 in AMRS equity
  - *Operations:* Amyris to provide formulation expertise, manufacturing, distribution, and operational functions
  - *Intellectual Property:* developed by AMRS for Stripes, to be owned by Stripes HoldCo

- **Acquisition of Interfaces Industria E Comércio De Cosméticos Ltda. ("Interfaces")**, a cosmetics manufacturer headquartered in Vinhedo, Brazil (close to Campinas)
  - *Status*: non-binding LOI executed on February 22nd
    - Definitive agreements expected to be signed by March 22nd following completion of the first pilot batch production and due diligence
  - *Purpose*: acquisition of 100% of Interfaces stock
  - *Consideration*: up to $12.7 million in cash
    - $3.18 million at closing
    - $3.18 million in 24 equal monthly installments from the start date of AMRS product production (within 90 days from closing)
    - $6.35 million earnout for José Roberto dos Santos (CEO) continued employment + certain milestone achievements
  - *Closing Conditions*:
    - Execution of definitive agreements (Quota Purchase Agreement)
    - Employment letter (5-year term) executed between Interfaces and CEO

- **Acquisition of Serviços De Gestão Empresarial Ltda ("Selia")**, a full-service provider of digital sales for retail and e-commerce businesses, including e-commerce platform, operations, marketing, finance, marketplace, logistics, customer service center, and tax planning
  - *Status*: non-binding LOI executed on March 3rd
    - Definitive agreements expected to be signed by end of April following completion of due diligence
  - *Purpose*: acquisition by AMRS of 60% of Selia stock
  - *Consideration*: up to $20 million in cash
    - $16 million at closing
    - Up to $4 million eanout for the achievement of gross merchandise volume goals by February 2023
  - *Closing Conditions*:
    - Execution of definitive agreements (SPA, Shareholders Agreement, Operating Agreement)
  - *Break-Up Fee*: if AMRS or Selia Sellers fail to consummate the closing, the non-failing party receives 10% of the Consideration (= $2M)

| Status: for APPROVAL | APPROVED ☒ CONDITIONALLY APPROVED ☐ NOT APPROVED ☐ |
|---|---|
| **Notes**: <br> NLK: Matters in Sections 3.2.4 (M&A transactions) and 3.2.5 (Financings) covered (including Board ratifications & approvals) in the Strategy session of the Board meeting; starting at 10:30am. <br> JM: the aggregate construction cost matches the ~cost that AMRS outlined to the Board in earlier discussion about the EcoFab transaction to build-out that facility to meet our shipping & fulfilment needs; no shift to total economics already approved by the Board. <br> EA: 80% to launch, and tracking against those #s. <br> JM: Reviewed great new asset, the Interfaces asset in BR. Then, Selia, which is about fulfillment & supply chain execution across geographies, as we expand in EU (Selia does this in BR for 29 different brands), great platform for AMRS beauty brands. Both BR deals relate to infrastructure to support growth for AMRS brands. <br> SM: Best solution to buy this capability v. paying an entity to do this for us? <br> JM: Not a question for our own facility (Interfaces), but question mark for the Selia matter (not a no-brainer, need to get through DD to be certain). <br><br> **[TAKE-AWAY #12: JM & team to proceed w/ DD on Selia, then to revert to AC/Board for approval prior to close]** | |

### 3.2.5  Financing Agreements

- **WeMedia (SuperOrdinary affiliate) Convertible Note**
  - *Borrower*: WeMedia Shopping Network Holdings Co., Limited (WeMedia)
    - startup incorporated in British Virgin Islands
    - parent of SuperOrdinary, a commercial partner of Biossance in the Greater China Territory
    - 34% owned by Julian Reis and 66% owned by other investors
  - *Status*: documents finalized between parties; accounting treatment research completed
  - *Purpose*: bridge loan during interim period while WeMedia secures $150 million equity raise
  - *Key Terms*:

- Principal amount of Note: $10 million
- Interest: compounding at 8% per year (accruing until Note is repaid or converted)
- Maturity: 3 years (i.e., March 2025)
- Security: senior secured  lien on all assets
- Optional Conversion (at AMRS' option) upon:
    - IPO or De-SPAC – at the IPO price (no discount)
    - Equity Financing – at the Equity Financing price (no discount)
    - Sale of Company – at the Sale price (no discount)
    - Maturity – at the price of last equity round
- Repayment of principal and accrued interest upon:
    - Receipt of $50M by WeMedia in one or more capital raise transactions (debt or equity)
    - Maturity
- Customary representations and warranties
- Customary covenants including ongoing access to financial information of WeMedia

| Status: for APPROVAL | APPROVED ☒ CONDITIONALLY APPROVED ☐ NOT APPROVED ☐ |
|---|---|
| **Notes**: WeMedia Note requires Board approval [surpasses $5M limit for CEO approved transactions]<br><br>NLK: Introduced this matter for JM/HK to elaborate.<br>JM: SO represents Biossance in CH; being opportunistic b/c WM/SO in trouble, AMRS being helpful but can also take this asset if not paid back by March, as AMRS is not in the business of loaning $<br>HK: Nothing to add.<br>FK: JM, I want to caution on the downside, as the potential liability not always been v transparent.<br>JM: HK has done a lot of DD, feel v good about the security | |

## 3.3.    BOARD RESOLUTIONS

**Corporate Governance Approvals**

### 3.3.1    Audit Committee Charter Amendment

We are asking the Board to approve amendments to the Audit Committee charter as part of our annual governance and compliance review cycle (typically held in Q4), which includes the review and benchmarking of committee charters, subject in each case to the recommendation of such amendments by the applicable committees. Certain changes to the Audit Committee charter were proposed by management to the Audit Committee in its Q4 FY21 meeting; the Audit Committee confirmed final changes to its charter at its Q1 FY22 meeting.

| Status: for APPROVAL w/ recommendation by AC | APPROVED ☒ CONDITIONALLY APPROVED ☐ NOT APPROVED ☐ |
|---|---|

<table>
<tr><td>

**Notes**:

<span style="color:red">**AC Charter changes**: Remove the Committee's oversight of operational performance and clarify that the Committee will review and recommend for Board approval certain M&A, significant or strategic transactions, as well as to reflect certain comments by the Committee regarding financial disclosure and risk oversight responsibilities
(CAO Report, which Legal suggests will now include any report from the Company's Disclosure Cmt)

**Dates when Legal received earnings scripts:**
- <u>FY20</u>:
  - <u>Q1</u>: received 3/8 – earnings on 3/12
  - <u>Q2</u>: didn't receive
  - <u>Q3</u>: didn't receive
  - <u>Q4</u>: received 11/3 – earnings on 11/5
- <u>FY21</u>:
  - <u>Q1</u>: received 3/1 – earnings on 3/2
  - <u>Q2</u>: received on 5/5 – earnings on 5/6
  - <u>Q3</u>: received on 8/4 – earnings on 8/5
  - <u>Q4</u>: didn't receive
- <u>FY22</u>:
  - <u>Q1</u>: received 3/1 – earnings on 3/2</span>

</td></tr>
</table>

### 3.3.2    2022 Annual Meeting of Stockholders and Proxy Statement Matters

**A.    Proxy Statement; Inclusion of CD&A and LDICC Report in Proxy Statement**

The Secretary's Corporate Legal team is working on the proxy statement (the "***Proxy Statement***") for the Company's 2022 Annual Meeting of Stockholders (the "***Annual Meeting***"). The Secretary will outline certain matters related to the Proxy Statement and Annual Meeting that require the Board's approval. <mark>She will share with the full Board a final draft of the Proxy Statement for its review and input by the end of March as she expects to file the <span style="color:orange">preliminary</span> Proxy Statement by <span style="color:orange">April 1st</span> and the <span style="color:orange">definitive</span> Proxy Statement by <span style="color:orange">April 12th</span>.</mark>

She is also asking the Board to approve the inclusion of the "Compensation Discussion and Analysis" section and the Leadership, Development, Inclusion and Compensation Committee (the "***LDICC***") Report in the Proxy Statement, subject to the recommendation of the LDICC at its March 8th meeting.

<table>
<tr><td><u>Status</u>: for APPROVAL w/ recommendation by LDICC</td><td>APPROVED ☒<br>CONDITIONALLY APPROVED ☐<br>NOT APPROVED ☐</td></tr>
<tr><td colspan="2">Notes:<br><br><br><br><br></td></tr>
</table>

AMYRIS-0000147

**B.        Stockholder Communications Procedures**

The Secretary is asking the Board to approve and adopt the following procedures for stockholder communications with members of the Board in 2022, subject to the recommendation of the Nominating and Governance Committee (the "**NGC**") at its March 9th meeting. No changes to such procedures are being recommended at this time.[1]

**C.        Section 16 Officers and Executive Officers**

We are asking the Board to review the Company's Section 16 officers[2] and executive officers[3] for the purpose of our public filings with the SEC upon recommendations by the NGC at its March 9th meeting. Based on relevant SEC rules, the NGC is not proposing any changes to Section 16 officers and executive officers at this meeting. Therefore, we propose that the Board find that: (i) the Section 16 officers are John Melo, Han Kieftenbeld, Eduardo Alvarez and Nicole Kelsey, as well as Tony Hughes (due to his status as principal accounting officer); and (ii) the executive officers are John Melo, Han Kieftenbeld, Eduardo Alvarez and Nicole Kelsey.

| **Status**: for APPROVAL w/ recommendation by NGC | APPROVED ☒<br>CONDITIONALLY APPROVED ☐<br>NOT APPROVED ☐ |
|---|---|
| **Notes**: | |

---

[1] From the Company's 2021 Proxy Statement: "The Board  has established a process by which stockholders may communicate with the Board or any of its members, including the Board Chairman, or to the independent directors generally. Stockholders and other interested parties who wish to communicate with the Board or any of the directors may do so by sending written communications addressed to the Secretary of Amyris at 5885 Hollis Street, Suite 100, Emeryville, California 94608. The Board has directed that the Secretary will review all communications to determine whether they should be presented to the Board. Following such review, the Secretary will determine which communications should be compiled and submitted to the Board, or a selected group of directors or individual directors, on a periodic basis. The purpose of this screening is to allow the Board to avoid having to consider irrelevant or inappropriate communications (such as advertisements and solicitations). The screening procedure has been approved by a majority of the non-management directors of the Board. Directors may at any time request that the Secretary forward to them immediately all communications received for the Board. All communications directed to the Audit Committee in accordance with the procedures described above that relate to accounting, internal accounting controls or auditing matters involving Amyris will be promptly and directly forwarded to the Chairman of the Audit Committee who will direct distribution to the Audit Committee members as required."

[2] SEC Rule 16a-1(f) defines "officer" to mean:
*"... an issuer's president, principal financial officer, principal accounting officer (or, if there is no such accounting officer, the controller), any vice-president of the issuer in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the issuer. Officers of the issuer's parent(s) or subsidiaries shall be deemed officers of the issuer if they perform such policy-making functions for the issuer."*

[3] SEC Rule 3b-7 defines "executive officer" to mean, when used with reference to a registrant:
*"...its president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant. Executive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant."*

AMYRIS-0000148

**D.     Director Independence and Qualification Determinations**

Under applicable securities laws and regulations, and the rules, regulations and listing requirements of Nasdaq (the "*Nasdaq Rules*"), the Board must make a determination regarding the independence of the members of the Board, and the Company must disclose in the Proxy Statement which members of the Board and the Board's committees are independent, in each case as determined by the Board under the Nasdaq Rules, which criteria for independence determinations include various objective standards and a subjective test.

Subject to the recommendation of the NGC at its March 9th meeting, we are proposing that the Board find that:

- the following non-employee directors are independent under the Nasdaq Rules, with a determination that such directors are free from any relationship that, in the Board's judgment, would interfere with the exercise of independent judgment in implementing the responsibilities of a director: John Doerr, Ana Dutra, Geoffrey Duyk, Frank Kung, James McCann, Steven Mills, Ryan Panchadsaram, Lisa Qi, and Julie Washington;

- the following directors are not independent under the Nasdaq Rules: (i) John Melo is not independent because he is an Amyris employee, and (ii) Philip Eykerman is not independent because he is an employee of Koninklijke DSM N.V. or its affiliates (with which we have commercial and financial relationship);

- a majority of the members of the Board is independent under the Nasdaq Rules;

- each of the NGC (Doerr, McCann and Qi), the Audit Committee (Duyk, Mills, and Panchadsaram) and the LDICC (McCann, Mills, Panchadsaram, and Washington) is composed exclusively of independent directors under applicable Nasdaq Rules;

- all of the members of the Audit Committee meet the additional independence requirements applicable to audit committee members under the Nasdaq Rules and Rule 10A-3 of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*");[4]

- all of the members of the Audit Committee meet the Nasdaq Rules requirement that they be able to read and understand fundamental financial statements;

- Steven Mills, who serves as the Chair of the Audit Committee, is an "audit committee financial expert"; [5] and

- all of the members of the LDICC meet the additional independence requirements applicable to compensation committees under the Nasdaq Rules.[6]

---

[4] Audit committee members are required to not receive fees other than standard director compensation and not be affiliates of the Company other than by virtue of being on the Board.

[5] As defined in SEC regulations, and meets the additional financial sophistication requirement for at least one member of the Audit Committee contained in Rule 5605(c) of the Nasdaq Rules.

[6] This includes consideration of all factors specifically relevant to determining whether a director has a relationship to Amyris that is material to that director's ability to be independent from management in connection with the duties of a compensation

AMYRIS-0000149

In making the foregoing determinations regarding Board and committee independence and Audit Committee qualifications, the NGC referred to excerpts of the Nasdaq Rules and other applicable rules of the SEC relating to independence and audit committee qualifications, and we note that the foregoing conclusions are based on input from legal counsel.

| **Status**: for APPROVAL w/ recommendation by NGC | APPROVED ☒ <br> CONDITIONALLY APPROVED ☐ <br> NOT APPROVED ☐ |
|---|---|
| **Notes**: | |

### E.    Director Nominations and Board Proposals

Subject to the recommendation of the NGC at its March 9th meeting, we are asking the Board to:

- Nominate John Doerr, Ryan Panchadsaram and Lisa Qi for election as Class III directors at the 2022 Annual Meeting, to serve as Class III directors of Amyris until the expiration of their terms in 2025 and until such director's successor has been elected and qualified, or until such director's earlier death, resignation or removal.

- Authorize and direct the officers of Amyris to mail a Notice of Annual Meeting (or a Notice of Internet Availability of Proxy Materials as permitted by SEC rules) to the Company's stockholders of record as of the Annual Meeting record date (March 30th) and to solicit proxies for the voting of their shares with respect to the following matters (for vote in Proxy):

   o Election of the Company's Class III directors: John Doerr, Ryan Panchadsaram and Lisa Qi.
   o Ratification of the appointment of the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.
   o Approval of an amendment to the Company's certificate of incorporation to increase the number of total authorized shares from 455,000,000 shares to [555,000,000] shares and the number of authorized shares of common stock from 450,000,000 shares to [550,000,000] shares.

- Authorize and direct the officers of Amyris to:

   o prepare a Proxy Statement pursuant to Section 14(a) of the Exchange Act and file such Proxy Statement with the SEC and Nasdaq, and take all further actions deemed necessary or appropriate to cause the Company to perform its obligations in relation to the filing and distribution of the Proxy Statement; and

   o prepare, file with the appropriate governmental authorities, and mail (or make available via the internet as permitted by SEC rules) broker search cards, proxy materials, the Company's 2021 Annual Report and any other documents they may deem necessary or

---

committee member, including, but not limited to: (i) the source of compensation of such director, including any consulting, advisory or other compensatory fee paid by Amyris to such director; and (ii) whether such director is affiliated with Amyris.

AMYRIS-0000150

appropriate in connection with the Annual Meeting anticipated to be held on Friday, May 27, 2022, via webcast, at 2:00 p.m. Pacific Time.

| **Status**: for APPROVAL w/ recommendation by NGC | **APPROVED** ☒ |
|---|---|
| | **CONDITIONALLY APPROVED** ☒ |
| | **NOT APPROVED** ☐ |
| **Notes**: <br><br>**Past authorized capital increases:** <br>May 2020: from 255M to 355M <br>May 2021: from 355M to 455M <br><br>==Approve up to $100M increase, consistent with prior years, contingent upon CEO and CFO determining final amount before proxy filing== | |

### 3.3.3   Prior Meeting Minutes

Draft minutes of the Q4FY21 meeting (November 17, 2021) of the Board are attached for review and approval.

| **Status**: for APPROVAL | **APPROVED** ☒ |
|---|---|
| | **CONDITIONALLY APPROVED** ☐ |
| | **NOT APPROVED** ☐ |
| **Notes**: | |

### 3.4.   LITIGATION/INVESTIGATION UPDATE

At the meeting, the Secretary will provide a brief update on the status of relevant legal matters since the last Board meeting, including material updates regarding (a) the securities class action lawsuit filed against the Company on April 3, 2019 (and related shareholder derivative lawsuits), (b) the arbitration filed with the International Chamber of Commerce on August 23, 2020, and the lawsuit filed in the Southern District of New York on September 10, 2020, by Lavvan, Inc. against the Company (regarding the Research, Collaboration and License Agreement dated March 18, 2019), and (c) the derivative shareholder demand received on August 10, 2021, managed by the Audit Committee with independent litigation counsel.

   A)   **Securities Class Action:**





Derivative cases [Following settlement of class action, these 2 cases are pending resolution either through MTD or settlement]



B) **Lavvan Arbitration (ICC) & Litigation (SDNY):**

C) **New Shareholder Derivative Demand:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



| | |
|---|---|
| **Status: for INFORMATION** | |
| **Notes:** | |
| **NLK:** Summarized the 3 active matters: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | |

## 3.5.    REFERENCE MATERIALS

### 3.5.1    Agenda Planner and Calendar

The following additional materials are included for reference:

- FY22 Board Agenda Planner

- FY22 Master Board Calendar

### 3.5.2    Board and Committee Minutes and Consents

For the Board's reference, below is a list of meetings of the Board, Audit Committee, LDICC, and NGC since the last regular Board meeting for which minutes are to be approved (except unanimous written consents):

- Board: November 17, 2021 (Q4 meeting), January 21, 2022 UWC (Ana Dutra appointment, derivative shareholder demand, EcoFab shares)
- Audit Committee: November 1, 2021 (Q4 meeting), November 9, 2021 (ATM offering); December 28, 2021 (stock buyback), February 1, 2022 (stock buyback)
- LDICC: November 16, 2021 (Q4 meeting); December 22, 2021 (succession plan)
- NGC: November 17, 2021 (Q4 meeting), January 20, 2022 UWC (Ana Dutra appointment)
- Pricing Committee: November 9, 2021 (convertible notes offering)

The latest signed Board and committee minutes and unanimous written consents will be provided as updates at each regularly scheduled Board meeting. Due to the volume of these materials, the committee minutes and written consents are available for viewing upon request.

| Status: for INFORMATION | |
|---|---|
| Notes: | |

## 4. Operations and Financial Updates (9:34 – 10:02am)

*John Melo, Eduardo Alvarez, Nicole Kelsey and Han Kieftenbeld*

5.1    Operations Update

| Status: for APPROVAL of BB Plant Budget Update | APPROVED ☒<br>CONDITIONALLY APPROVED ☐<br>NOT APPROVED ☐ |
|---|---|
| Notes: EA (9:34 – 9:57am)<br><br>**The Barra Bonita budget needs to be approved for SOX control purposes** (it has never been formally approved by the AC, OFC or Board. The first time the Board reviewed it was in Q1FY19 ($~70M); then OFC reviewed it on a quarterly basis).<br><br>Snapshot from Board book pg. 337 (Ops. deck pg. 25). | |

| | $ MM | Details |
|---|---|---|
| Budget as of April 2020 | $72 | |
| Approved Improvements | $11 | We approved higher costs reflecting changes in five project areas: design changes (more elaborate civil foundations), electromechanical designs, extra labor shifts, higher costs for Covid containment, and new equipment. |
| Budget as of September 2021 | $83 | |
| Market Inflationary | 21-25 | Reflects market increases in Brazil of ~25-30% higher commodity prices and expedited labor costs to meet Q2 start up. Benchmarked |
| Budget 12/21 | $104 - $108 | Will manage project budget to this level |
| Project restart costs | $7 | Sunk Costs: expenditures incurred repeatedly as we halted the project 3-4 times, e.g. we had to replace a contractor (Aracons) and had duplicated costs for redesign and other project activities. |
| Accelerated sterilization | $4 | Civil construction and electromechanical assembly to meet start-up target date at $3-4 MM |
| Total Spend | $115 - $118 | Will stay as close to $115 MM based on 2 levers – FX factors and ensuring no more impact of COVID delays or additional supply chain disruption |

EA: Reviewed the pages in his COO deck for the Board re status on construction, significant anticipated changes ($48M margin improvement; cash basis impact of >$80M for FY22).
JM: Provided additional
EA: Over 800 e'ees on site working toward construction; still on track for April start of the plant. Paused for questions for the Board.
NLK: Board needs to approve the budget; EA, can you provide scope for the Board?
EA: Sure thing, the increase in the spend has been due mostly by inflation & other factors not in our control.
JM: No other plant has this capacity in the world.
AD: Why was BB the chosen location?

AMYRIS-0000154

<table>
<tr><td>

**JM**: Quality to cane & access to infrastructure for growth. BB owned by JV b/w Shell & Cosan, solid global governance. Property allows for expansion in the future; locked in pricing mechanism w/ Raizen (Cosan affiliate).

**AD**: Having Raizen & Cosan behind this construction is huge.

**EA**: Switching to consumer ops. New brands are excelling: JVN Hair doubled online orders month over month; Rose Inc. also showing strong growth, esp. internationally. For the Reno plant, we're working in phases; hope to be operational by July-August. As we're growing this business, we'll shift up to 70% production for Biossance, JVN Hair & Pipette. We continue to add assets in production & distribution, and leadership (LT you met earlier this morning; we have also added Francisco Neto, v seasoned consumer products based in Portugal). I wanted to give you a sense of capabilities for growth. Started the year w/ 24 production sites; focusing on switching down to <6 sites over the course of FY22 & FY23.

**JW**: Seems like a lot of work; how are you prioritizing?

**EA**: Didn't cover some of the new ingredients, pushing to production in H2FY22.

</td></tr>
</table>

5.2     Financial Review and Investor Relations Update

| **Status: for INFORMATION / DISCUSSION** | |
|---|---|
| **Notes**: **(HK 9:57 – 10:02am//Covered Q4/FY22 performance & Board questions//Board break)** <br><br> **HK**: Reviewed Q4FY21 key deliverables; beat revenue consensus (Q4: $61M, we delivered $65M; FY22: $338M, we delivered $342M). Reviewed the convertible financing; only 2 items left in the debt stack, much more simplified. <br> **JM**: Questions; take 5 min break | |

**Break** ............................................................................................................... 10:02 a.m. – 10:07 a.m.
**(Board chatted from 10:07-10:10 am: BoardIntelligence kicks off after 3 hours when on iPad)**

5. 3     2022 Budget and Business Plan **(HK 10:10 – 10:45am)**

| **Status: for INFORMATION** | |
|---|---|
| **Notes**: <br> SEE NLK Notes in section below | |

## **5. Strategic and Business Development Updates** **(10:10 – 10:45)**

*John Melo, Eduardo Alvarez, Nicole Kelsey and Han Kieftenbeld*

6.1     Strategy Update

6.2     Portfolio & Pipeline Review

AMYRIS-0000155

6.2.1   New Brands Status: MenoLabs, Stripes, ONDA, DB Men, A$AP Rocky, India

6.2.2   Project Pillar

6.2.3   Project Pioneer

6.2.4   Givaudan

6.2.5   Walmart

6.2.6   Experiential Retail stores

6.2.7   Geographic Expansion – UK, Brazil, Europe and China

6.3   Business Priorities

6.4   2022 Outlook

| Status: for INFORMATION / DISCUSSION | |
|---|---|

**Notes**:

JM: Overview of profitability by Q4-end, and expectations for growth & profitability in FY23.
HK: Provided the multi-year revenue (by category) table for the Board, which JM reviewed in detail.
SM: How much do you feel at risk?
JM: All contracted ($132M), w/ some upside expected from earnouts, sclareol, and other ingredient production.
SM: What puts these #s at risk?
JM: BB start-up being delayed
EA: 50% of that # is coming from BB
HK: Capacity and product mix.
RP: Any consumer revenue risk tied to BB?
JM: V minimal; dependent on farnesene for S/HS production
HK: 2022 Consumer Revenue Plan by Brand
JM: Pipette at risk. In 2nd bucket, activities added over course of FY21: JVN Hair, $30M plan (active run rate of $50M for year): Rose Inc., $20M (expect up to $25M); Olika, concerned where it sits in the portfolio, may not be here by FY-end, b/c of lack of confidence in the # and how it fits in the portfolio, depends on success of Walmart engagement → impacts headcount & capacity across the company; CBR, just scratching the surface; Terasana, not performing at level expected, despite phenomenal formulation, but re-thinking how to reformulate to target acne; MGE, good shot to hit $10M; BL, $3M, introduced them to Unilever that is adopting the live selling app for its prestige brands. Launching/Buying FY22: MenoLabs acquisition ($27M), congratulate HK for today's closing; Stripes, NW brand for menopause; EcoFabulous (Gen Z Clean Beauty, skin care + cosmetics).
HK: MenoLabs will start to accrue revenue as of tomorrow; Stripes & EcoFab, Q3 launches.
JM: Pause for questions; then review M&A list for discussion.
FK: Any sensitivity analysis for delay of plant coming online or other factors?
HK: Yes, we have; talking differently externally to manage investor/mkt expectations. We have a detailed breakdown for each of these brands for each distinct channel, as well as what EA needs from supply chain & production perspectives.
JM: $10-15M opportunity w/ Walmart in execution right now. Major retailer in BR desperate for access to JVN Hair products. More successful each brand, more demand from retailers, more power to negotiate more doors & velocity in each location. You've seen planning for FY22; thinking about

AMYRIS-0000156

FY23, 3 brands in discussion: DB Men (FY23 launch), global – EU, CH, Africa, LatAM; A$AP Rocky (FY2- launch), v committed to skin, hair & wellness; v interesting partner for Gen Z/young millennial men, US focus); India (leading actress, based in London), specific for Indian & SEA skin (2 color pigments v unique to SEA & Southern Indian skin; have to blend & mix color cosmetics), dropped from Estee Lauder engagement. For this year's brands: Stripes (Sephora), MenoLabs (Walmart), EcoFabulous (Sephora): clear channels that allow us to get to $20M run rate for 1st Q activity.

<u>AD</u>: Potentially 3 new segments: Men, GenZ, pigmentation skin -> mkt sizes & competitive landscapes? Could be dilution of focus; is it worth the effort?

<u>JM</u>: Quite a bit of strategic thought for each except the Indian target (in-bound). The real test: where are the retailers right now? GenZ is #1 need for retailers: Sephora approached us at FY20-end; one big player, The Ordinary (AMRS supplies the squalane). Segment of consumer is driving a lot of influence for market messagin on social platforms. Men had been on our list; this is actually the riskiest brand opportunity: this would be the one I drop.

<u>AD</u>: Intuitively, I think you're spot on.

<u>JW</u>: Is there a map? Love the retailers, but need to drive these brands through a consumer need. Where the needs are, where the gaps are in our portfolio? Per AD's secondary point, focus on the [5] brands on this map, that's where AMRS could make really big $.

JM: How do we think about the portfolio? What are the biggest bets right now (4-5 enough to hit #s: Biossance, JVN Hair, Rose Inc., Pipette, CBR). Macro-lens: where is consumer headed & is it attracted place for our technology (GenZ; menopause). Micro-lens: look at white space in the market for every category we go into; develop our specific positioning of each of our brands.

**[TAKE-AWAY #10: CH to come in & share how we position specific brands for development]**

<u>LQ</u>: Do we have GM plans for the consumer business?

<u>JM</u>: 61-63% blended GM. How much we do through a channel, and the actual channel → bigger inputs on how GM is impacted than any particular brand. 3 projects on the list, step-outs; not looking for decision or asking for approval to move forward: would like thought partnership from Board (AC or a subset): Project Pillar (FK: venture in CH to accelerate clean chemistry into CH mkt); Project Pioneer (Shaklee deal not dead, price has decreased significantly, and new interesting structure); Givaudan (interested in working on beauty ingredient business (Aprinnova); long-term R&D a'ent, keep ingredients for AMRS for first few years, then scale commercialization through Givaudan; $300-400M business potential).

**[TAKE-AWAY #11: Sub-Cmt of the Board to assist JM on leading on these transactions]**

<u>FK</u>: background introduction …

<u>JM</u>: Walmart reference: for the Tia Mowry, 1st Black woman beauty brand

<u>RP</u>: How do you want us to raise our hands?

<u>JM</u>: You, RP, JMcC + SM; don't expect a lot of work, but a couple of touchpoints b/w Q1 & Q2 Board mtgs.

6. <u>Executive Session</u> **(11:05 – 11:??am)**

AMYRIS-0000157